103 Cal.Rptr.2d 672 (2001)
24 Cal.4th 945
16 P.3d 94
CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON et al., Petitioners,
v.
The SUPERIOR COURT of Los Angeles County, Respondent;
Powerine Oil Company, Inc., et al., Real Parties in Interest.
No. S084057.
Supreme Court of California.
February 1, 2001.
Rehearing Denied April 18, 2001.[*]
*673 Hancock, Rothert & Bunshoft, Patrick A. Cathcart, Los Angeles, William J. Baron, San Francisco, Jennifer D. McKee, Laura A. Pace, Robert J. Zapf and Jo-Ann Horn Maynard, Los Angeles, for Petitioners.
Sinnott, Dito, Moura & Puebla, Randolph P. Sinnott, Los Angeles; Wiley, Rein & Fielding, Laura A. Foggan, Daniel E. Troy, N. Christopher Hardee, Wash., DC, John Dunfee; Bien & Summers and Elliot L. Bien, San Francisco, for Insurance Environmental Litigation Association as Amicus Curiae on behalf of Petitioners.
Charlston, Revich & Williams, Ira Revich, Los Angeles, and Nicholas R. Andrea *674 for The Home Insurance Company as Amicus Curiae on behalf of Petitioners.
O'Melveny & Myers, Richard B. Goetz and Lawrence M. Hadley for Century Indemnity Company as Amicus Curiae on behalf of Petitioners.
Greines, Martin, Stein & Richland and Irving H. Greines, Beverly Hills, for Truck Insurance Exchange as Amicus Curiae on behalf of Petitioners.
No appearance for Respondent.
Isola, Bowers, David R. Isola and Aaron L. Bowers, Acampo, for Real Party in Interest Powerine Oil Company.
Heller, Ehrman, White & McAuliffe, Robert S. Venning, David B. Goodwin and Esta L. Brand, San Francisco, for Real Party in Interest Powerine Oil Company and for Pacific Gas and Electric Company and Granite Management Corporation as Amici Curiae on behalf of Real Parties in Interest.
Nossaman, Gunther, Knox & Elliott, Scott P. DeVries and Elaine M. O'Neil, San Francisco, for Aerojet-General Corporation and Dover Diversified Industries, Inc., as Amici Curiae on behalf of Real Party in Interest Powerine Oil Company.
Zevnik, Horton, Guibord, McGovern, Palmer & Fognani, Mitchel Y. Horton and David S. Cox, Los Angeles, for ITT Industries, Inc., Pneumo Abex Corporation, Sunoco, Inc., and Pepsi Cola General Bottlers, Inc., as Amici Curiae on behalf of Real Party in Interest Powerine Oil Company.
Latham & Watkins, David L. Mulliken, Dorn G. Bishop, William C. Tayler, San Diego, and Jill N. Willis for Montrose Chemical Corporation of California, Navistar International Transportation Corp., Fluor Daniel, Inc., AstraZeneca, The Boeing Company, International Truck & Engine Corporation, Masco Tech, Maxwell Technologies, Inc., and Rohr, Inc., doing business as BF Goodrich Aerostructures Group as Amici Curiae on behalf of Real Party in Interest Powerine Oil Company.
Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Craig C. Thompson, Acting Assistant Attorney General and Timothy R. Patterson, Deputy Attorney General for the People of the State of California ex rel. Attorney General Bill Lockyer as Amicus Curiae on behalf of Real Party in Interest Powerine Oil Company.
Troop Steuber Pasich Reddick & Tobey, Kirk A. Pasich and Catherine L. Rivard, Los Angeles, as Amici Curiae on behalf of Real Party in Interest Powerine Oil Company.
David L. Alexander, Oakland; Farella, Braun & Martel, Deborah S. Balati and Pamela H. Davis, San Francisco, for City of Oakland and Board of Port Commissioners as Amici Curiae on behalf of Real Party in Interest Powerine Oil Company.
Brobeck, Phleger & Harrison, Donald W. Brown, Thomas M. Peterson and Laura J. Remington, San Francisco, for Aydin Corporation, Coltec Industries, Inc., Exxon Mobil Corporation, Fibreboard Corporation, Imperial Oil Limited, McKesson HBOC, Inc., Mascotech, Inc., Shell Oil Company and Tosco Corporation as Amici Curiae on behalf of Real Party in Interest Powerine Oil Company.
Adelson, Hess & Kelly, Randy M. Hess, Duane W. Shewaga, Campbell, and Michelle L. Fogliani for California Trustee's Association as Amicus Curiae on behalf of Real Party in Interest Powerine Oil Company.
Anderson Kill & Olick, Edward J. Stein, William G. Passannante and M. Christina Ricarte, New York, N.Y., for The Glidden Company as Amicus Curiae on behalf of Real Party in Interest Powerine Oil Company.
Stanzler Funderburk & Castelllon, Jordan S. Stanzler and Dennis G. Rolstad, San Francisco, for Weir Floway, Inc., as Amicus Curiae on behalf of Real Party in Interest Powerine Oil Company.
*675 Munger, Tolles & Olson, Cary B. Lerman, Los Angeles; Spriggs & Hollingsworth and Marc S. Mayerson, Wash., D.C., for Aventis Cropscience USA, Inc., as Amicus Curiae on behalf of Real Party in Interest Powerine Oil Company.
Irell & Manella, Los Angeles, and Thomas W. Johnson, Jr., Newport Beach, as Amici Curiae on behalf of Real Party in Interest Powerine Oil Company.
MOSK, J.
We granted review to resolve an important issue arising under the standard comprehensive general liability insurance policy.
In one provision, the standard policy imposes on the insurer a duty to defend the insuredin typical language, it generally states that the insurer has a "duty to defend" the insured "in any suit seeking damages" for harm alleged within coverage.
In another provision, the standard policy imposes on the insurer a duty to indemnify the insuredagain in typical language, it generally states that the insurer "will pay all sums that the insured becomes legally obligated to pay as damages" for harm proved within coverage.
In Foster-Gardner, Inc. v. National Union Fire Ins. Co. (1998) 18 Cal.4th 857, 77 Cal.Rptr.2d 107, 959 P.2d 265 (hereafter sometimes Foster-Gardner), we addressed the question, which was of first impression in the State of California, whether the insurer's duty to defend the insured in a "suit seeking damages" was limited to a civil action prosecuted in a court. We answered in the affirmative. We went on to conclude that the duty did not extend to a proceeding conducted before an administrative agency pursuant to an environmental statute.
In this cause, we address the question, also of first impression in this state, whether the insurer's duty to indemnify the insured for "all sums that the insured becomes legally obligated to pay as damages" is limited to money ordered by a court. We shall answer in the affirmative. We shall go on to conclude that the duty does not extend to any expenses required by an administrative agency pursuant to an environmental statute.

I
This cause arises from a petition for writ of mandate filed in the Court of Appeal for the Second Appellate District, and subsequently assigned to Division Three thereof. The petitioners are Certain Underwriters at Lloyd's, London, and Certain London Market Insurance Companies, hereafter collectively the London Insurers; the respondent is the Superior Court of Los Angeles County; and the real parties in interest are entities including Powerine Oil Company, Inc.
The petition for writ of mandate, as the Court of Appeal would later state, was submitted against this background:
"Powerine was engaged in the oil refining business for approximately 60 years. Through its predecessor, Rothschild Oil [Company], it commenced oil refining operations in Santa Fe Springs, California, in the mid 1930's. Over the years it expanded those operations and by the late 1970's Powerine's business occupied over 100 acres and employed over 500 people. In addition, Powerine also engaged in oil and petroleum-related exploration, production, terminaling and transportation operations throughout the western states. However, in approximately 1985, a soft petroleum market resulted in a significant financial reversal, eventually forcing Powerine into bankruptcy. Ultimately, it divested itself of all of its operations except for its refinery in Santa Fe Springs. Even so, that refinery [was] only ... periodically operated between 1986-1995. Since the latter date, it has not been operated at all, and only a skeleton crew of employees has remained, primarily for environmental compliance and equipment maintenance purposes."
*676 Read in conjunction with all of its supporting papers, the petition for writ of mandate contains allegations, subsequently admitted or at least not denied, to the following effect:
Highlands Insurance Company filed a complaint and thereby initiated a civil action in the Superior Court of Los Angeles County for declaratory relief against Powerine, among others. In pertinent part, it alleged, in substance, that it had issued Powerine various comprehensive general liability insurance policies; the United States Environmental Protection Agency (EPA) had instituted a proceeding against Powerine pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. § 9601 et seq.) for the cleanup of a contaminated site in Monterey Park, the so-called Operating Industries, Inc., Superfund Site, and for the abatement of the contamination's effects; Powerine demanded that Highlands defend and indemnify it in the pending proceeding; Highlands undertook to defend Powerine under a reservation of rights, and continued to do so. Highlands prayed for a declaration that it did not owe Powerine any duty to defend or any duty to indemnify in the pending proceeding.
Powerine filed a cross-complaint and thereby initiated a cross-action essentially for damages and declaratory relief against the London Insurers, among others. In the operative cross-complaint, which is the second amended one, Powerine alleged, in pertinent part and in substance, that the London Insurers had issued it various insurance policies, including policy No. LAB 2579, a comprehensive general liability insurance policy for a term from May 1, 1958, to May 1, 1961; the EPA had instituted a proceeding against Powerine pursuant to CERCLA for the cleanup of the contaminated Operating Industries, Inc., Superfund Site in Monterey Park, and for the abatement of the contamination's effects, and had required it, and would continue to require it, to expend funds therefor; the EPA had also instituted a proceeding against Powerine pursuant to CERCLA for the cleanup of a contaminated site in Santa Fe Springs, the so-called Waste Disposal, Inc., Superfund Site, and for the abatement of the contamination's effects, and had required it, and would continue to require it, to expend funds therefor; similarly, the California Regional Water Quality Control Boards for the Los Angeles and San Diego Regions (Regional Water Boards) had each initiated at least one proceeding of its own against Powerine by means of a cleanup and abatement order pursuant to the Porter-Cologne Water Quality Control Act (Porter-Cologne Act) (Wat.Code, § 13000 et seq.) relative to contaminated soil and groundwater at and around one or more sites in the region in question, and had required it, and would continue to require it, to expend funds therefor; in addition, several persons or entities had prosecuted to conclusion several civil actions in court against Powerine based on allegations of contamination; the London Insurers owed Powerine a duty to defend in the past actions, but denied that they did so; the London Insurers also owed Powerine a duty to indemnify in the past actions and the pending proceedings, but denied that they did so as well. Powerine prayed for, inter alia, a declaration that the London Insurers owed it a duty to indemnify in the pending EPA/CERCLA and Regional Water Boards/Porter-Cologne Act proceedings, and also prayed for damages for harm arising from their breach of the duty to defend in the past civil actions.[1]
The London Insurers filed an answer to Powerine's operative cross-complaint. In *677 addition to various admissions and denials, they asserted several affirmative defenses. One of the affirmative defenses was, in general, that they did not owe Powerine any duty to defend. More specifically, it was to the effect that they did not owe it any duty to defend in any proceeding conducted before an administrative agency pursuant to an environmental statute, as opposed to a civil action prosecuted in a court, because the duty was limited to the latter and hence could not extend to the former. Another of the affirmative defenses was, in general, that they did not owe it any duty to indemnify. More specifically, it was to the effect that they did not owe it any duty to indemnify for any expenses required by such an agency pursuant to such a statute, as opposed to money ordered by a court, because the duty was limited to the latter and hence could not extend to the former.
The London Insurers then filed a motion for summary adjudication of certain issues in Powerine's cross-action. There was a single issue at the threshold: Were the pending EPA/CERCLA and Regional Water Boards/Porter-Cologne Act proceedings the only matters at issue in the cross-action, to the exclusion of any other proceedings conducted before administrative agencies pursuant to environmental statutes, and also to the exclusion of any civil actions prosecuted in court? As to this issue, they claimed that the identified pending proceedings alone were at issue. There were, in effect, two issues of substance: First, did the London Insurers owe Powerine any duty to defend in any of the identified pending proceedings? Second, did they owe it any duty to indemnify for any expenses required therein? As to the first substantive issue, they claimed that there was no triable issue as to any material fact, and that they were entitled as a matter of law to an adjudication that they did not owe any duty to defend. As to the second substantive issue, they similarly claimed that there was no triable issue as to any material fact, and that they were entitled as a matter of law to an adjudication that they did not owe any duty to indemnify.
Powerine filed opposition to the London Insurers' motion for summary adjudication. It conceded more than they claimed, to the effect that only the pending Regional Water Boards/Porter-Cologne Act proceedings were at issue in the cross-action, to the exclusion even of the EPA/CERCLA proceedings.
After a hearing, the superior court issued an order granting in part, and denying in part, the London Insurers' motion for summary adjudication. It ruled that only the pending Regional Water Boards/Porter-Cologne Act proceedings were at issue in the cross-action. It did so in reliance on Powerine's concession of the point in its opposition. It ruled that there was no triable issue as to any material fact, and that the London Insurers were entitled as a matter of law to an adjudication that they did not owe Powerine any duty to defend in any of the identified pending proceedings. It did so in reliance on what, at the hearing, it had termed, and Powerine had not disputed, was Powerine's concession of the point in its opposition. But it also ruled that, apart from any triable issue as to any material fact, the London Insurers were not entitled as a matter of law to an adjudication that they did not owe Powerine any duty to indemnify for any expenses required therein. It did so because it concluded that the duty to indemnify was not limited to money ordered by a court, but could extend to expenses required by an administrative agency pursuant to an environmental statute.
It was against the superior court and its order denying their motion for summary adjudication of the issue of their duty to indemnify Powerine that the London Insurers submitted their petition for writ of mandate.
Directly after filing, the Court of Appeal ordered the parties to show cause why the relief requested in the London Insurers' *678 petition for writ of mandate should, or should not, be granted. Powerine filed a reply to the petition, in opposition to relief. The London Insurers filed a response to the reply, in support thereof. The superior court did not appear.
In its judgment, the Court of Appeal discharged the order to show cause and ordered issuance of a peremptory writ of mandate directing the superior court to vacate its order denying the London Insurers' motion for summary adjudication of the issue of their duty to indemnify Powerine and to make a new order granting what they sought. In an opinion authored by Justice Croskey and joined by Presiding Justice Klein, the Court of Appeal determined, albeit more impliedly than expressly, that the superior court's order denying the London Insurers' motion for summary adjudication of the issue of their duty to indemnify Powerine was subject to independent review. It went on to determine, more expressly than impliedly, that the order was erroneous, concluding that the duty to indemnify was limited to money ordered by a court, and did not extend to any expenses required by an administrative agency pursuant to an environmental statute, including any expenses required by the Regional Water Boards pursuant to the Porter-Cologne Act. It was of the view that, "when the Supreme Court decided Foster-Gardner it, in reality, also decided this case." In a dissenting opinion, Justice Aldrich, without identifying the standard of review, would have found no error, concluding to the contrary.
Powerine filed a petition for review. We granted its application. We now affirm.

II
The issue on review is whether the insurer's duty to indemnify the insured for "all sums that the insured becomes legally obligated to pay as damages," as imposed by the standard comprehensive general liability insurance policy, is limited to money ordered by a court.[2]

A
By way of background, the standard comprehensive general liability insurance policy was developed in 1940. (E.g., Wisconsin Label v. Northbrook Prop. & Cos. Ins. (2000) 233 Wis.2d 314, 329, fn. 3, 607 N.W.2d 276; Note, Liability Coverage for "Damages Because of Property Damage" Under the Comprehensive General Liability Policy (1984) 68 Minn.L.Rev. 795, 798.) Over the years that have followed, it has periodically been revised, appearing in various versions. (E.g., Wisconsin Label v. Northbrook Prop. & Cas. Ins., supra, 233 Wis.2d at p. 329, fn. 3, 607 N.W.2d 276; Note, Liability Coverage for "Damages Because of Property Damage" Under the Comprehensive General Liability Policy, supra, 68 Minn.L.Rev. at pp. 798-799; see Hartford Fire Ins. Co. v. California (1993) 509 U.S. 764, 772, 113 S.Ct. 2891, 125 L.Ed.2d 612.) It had its name changed to the standard commercial general liability insurance policy in 1986. (American Star Ins. Co. v. Insurance Co. of the West (1991) 232 Cal.App.3d 1320, 1323, fn. 1, 284 Cal.Rptr. 45.)
Since before the development of the standard comprehensive general liability insurance policy, courts have, of course, entertained civil actions.
Throughout the same period, various administrative agencies have conducted various *679 proceedings under various statutes, which generally provide for, or at least allow, subsequent civil actions prosecuted in a court at which the proceedings themselves may be reviewed.
In relatively recent years, administrative agencies like the EPA, which has been granted "extraordinary powers," have begun to conduct proceedings, which are of a "new" and "unique" type, pursuant to environmental statutes like CERCLA. (Ray Industries, Inc. v. Liberty Mut. Ins. Co. (6th Cir.1992) 974 F.2d 754, 764.) Similar administrative agencies, including the Department of Toxic Substances Control of the California Environmental Protection Agency, have begun to conduct similar proceedings pursuant to similar environmental statutes, including the Hazardous Waste Control Act (Health & Saf.Code, § 25100 et seq.) and also the Carpenter-Presley-Tanner Hazardous Substance Account Act (id., § 25300 et seq.), which is the "California version of CERCLA" (Nixon-Egli, Equipment Co. v. John A Alexander Co. (C.D.Cal.1996) 949 F.Supp. 1435, 1438; see Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra, 18 Cal.4th at p. 861, 77 Cal.Rptr.2d 107, 959 P.2d 265). Likewise, the Regional Water Boards have begun to conduct proceedings of their own pursuant to the Porter-Cologne Act.
Each of the cited environmental statutes makes the course and outcome of any proceeding before the administrative agency in question affect the course and outcome of any subsequent civil action prosecuted in a court, and does so to the agency's benefit and its subject's detriment, in order to give the subject an incentive toward compromise and a deterrent against litigation. (See generally 42 U.S.C. §§ 9604, 9606, 9607, 9609, 9613 (CERCLA); Health & Saf.Code, §§ 25350-25359.7, 25360-25367 (Carpenter-Presley-Tanner Hazardous Substance Account Act); id., §§ 25180-25195 (Hazardous Waste Control Act); Wat.Code, §§ 13300-13365 (Porter-Cologne Act).)

B
In order to resolve the issue on review, to which we now turn, we must determine the meaning of the standard comprehensive general liability insurance policy with regard thereto.
"An insurance policy is a contract between an insurer and an insured ..., the insurer making promises, and the insured paying premiums, the one in consideration for the other, against the risk of loss....
"To yield their meaning, the provisions of a policy must be considered in their full context.... Where it is clear, the language must be read accordingly.... Where it is not, it must be read in conformity with what the insurer believed the insured understood thereby at the time of formation ... and, if it remains problematic, in the sense that satisfies the insured's objectively reasonable expectations....
"The provisions of a standard policy" including one for comprehensive general liability insurance"must be so considered. Of course, when they are examined solely on a form, i.e., apart from any actual agreement between a given insurer and a given insured, the rules stated above apply mutatis mutandis. That is to say, where it is clear, the language must be read accordingly, and where it is not, in the sense that satisfies the hypothetical insured's objectively reasonable expectations." (Buss v. Superior Court (1997) 16 Cal.4th 35, 45, 65 Cal.Rptr.2d 366, 939 P.2d 766, citations omitted.)

C
Among the provisions of the standard comprehensive general liability insurance policywhich is surely comprehensive but hardly unlimited (Fresno Economy Import Used Cars, Inc. v. United States Fid. & Guar. Co. (1977) 76 Cal.App.3d 272, 279-280, 142 Cal.Rptr. 681)are the two with which we are here concerned.
*680 In the one provision, which is of direct and primary significance, the standard policy imposes on the insurer a duty to indemnify the insured, generally stating that the insurer "will pay all sums that the insured becomes legally obligated to pay as damages" for harm proved within coverage.
In the other provision, which is of indirect and secondarybut hardly lesssignificance, the standard policy imposes on the insurer a duty to defend the insured, generally stating that the insurer has a "duty to defend" the insured "in any suit seeking damages" for harm alleged within coverage. In the same provision, it grants the insurer a right to defend the insured, including a right to control the defense, generally stating that the insurer has a "right to defend" the insured "in any suit seeking damages" for harm alleged within coverage. Also in the same provision, it grants the insurer, evidently as part of the right to defend (see Diamond Heights Homeowners Assn. v. National American Ins. Co. (1991) 227 Cal.App.3d 563, 578, 277 Cal.Rptr. 906), a right to settle any at least potentially covered dispute involving the insured, generally stating that the insurer has a "right to settle any claim or suit" against the insured "as it may deem expedient"a "suit" being a dispute in the form of a civil action prosecuted in a court (Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra, 18 Cal.4th at pp. 878-882, 77 Cal.Rptr.2d 107, 959 P.2d 265), a "claim" being a dispute in some other form (ibid.).
The insurer's duty to indemnify the insured and the insurer's duty to defend the insured lie at the core of the standard policy. (See, e.g., Aerojet-General Corp. v. Transport Indemnity Co. (1997) 17 Cal.4th 38, 56-59, 70 Cal.Rptr.2d 118, 948 P.2d 909; Buss v. Superior Court, supra, 16 Cal.4th at pp. 45-47, 65 Cal.Rptr.2d 366, 939 P.2d 766.)
The duty to indemnify and the duty to defend are "correlative." (Ryan v. Royal Ins. Co. of America (1st Cir.1990) 916 F.2d 731, 735; see, e.g., Aerojet-General Corp. v. Transport Indemnity Co., supra, 17 Cal.4th at pp. 56-59, 70 Cal.Rptr.2d 118, 948 P.2d 909; Buss v. Superior Court, supra, 16 Cal.4th at pp. 45-47, 65 Cal. Rptr.2d 366, 939 P.2d 766.) That is to say, the duty to defend has as its purpose "to avoid or at least minimize liability ... before liability is established" (Aerojet-General Corp. v. Transport Indemnity Co., supra, 17 Cal.4th at p. 58, 70 Cal.Rptr.2d 118, 948 P.2d 909, italics added), and the duty to indemnify has as its purpose "to resolve liability ... after liability is established" (id. at p. 56, 70 Cal.Rptr.2d 118, 948 P.2d 909, italics added).
Although correlative, the duty to indemnify and the duty to defend are not "coterminous." (Ryan v. Royal Ins. Co. of America, supra, 916 F.2d at p. 735; see generally Aerojet-General Corp. v. Transport Indemnity Co., supra, 17 Cal.4th at pp. 56-59, 70 Cal.Rptr.2d 118, 948 P.2d 909.) They differ in their triggering: Whereas the duty to indemnify can arise only after damages are fixed in their amount (see Aerojet-General Corp. v. Transport Indemnity Co., supra, 17 Cal.4th at p. 56, 70 Cal.Rptr.2d 118, 948 P.2d 909; Buss v. Superior Court, supra, 16 Cal.4th at p. 46, 65 Cal.Rptr.2d 366, 939 P.2d 766), the duty to defend may arise as soon as damages are sought in some amount (see Aerojet-General Corp. v. Transport Indemnity Co., supra, 17 Cal.4th at p. 58, 70 Cal.Rptr.2d 118, 948 P.2d 909; Buss v. Superior Court, supra, 16 Cal.4th at p. 46, 65 Cal.Rptr.2d 366, 939 P.2d 766). They also differ in their substance: Whereas the duty to defend "entails the rendering of a service, viz., the mounting and funding of a defense" (Aerojet-General Corp. v. Transport Indemnity Co., supra, 17 Cal.4th at p. 58, 70 Cal. Rptr.2d 118, 948 P.2d 909; accord, Buss v. Superior Court, supra, 16 Cal.4th at p. 46, 65 Cal.Rptr.2d 366, 939 P.2d 766), the duty to indemnify "entails the payment of money" (Aerojet-General Corp. v. Transport Indemnity Co., supra, 17 Cal.4th at p. 56, *681 70 Cal.Rptr.2d 118, 948 P.2d 909; accord, Buss v. Superior Court, supra, 16 Cal.4th at p. 46, 65 Cal.Rptr.2d 366, 939 P.2d 766). They differ as well in their scope: Whereas the duty to indemnify may indeed be broad, the duty to defend must perforce be broader still. (See, e.g., Aerojet-General Corp. v. Transport Indemnity Co., supra, 17 Cal.4th at p. 59, 70 Cal.Rptr.2d 118, 948 P.2d 909; Buss v. Superior Court, supra, 16 Cal.4th at pp. 46-7, 65 Cal.Rptr.2d 366, 939 P.2d 766.) With this result: Where there is a duty to defend, there may be a duty to indemnify; but where there is no duty to defend, there cannot be a duty to indemnify. (See Buss v. Superior Court, supra, 16 Cal.4th at p. 47, fn. 10, 65 Cal. Rptr.2d 366, 939 P.2d 766.)

D
In Foster-Gardner, we held that the insurer's duty to defend the insured in a "suit seeking damages" under the standard comprehensive general liability insurance policy was limited to a civil action prosecuted in a court. (Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra, 18 Cal.4th at pp. 878-888, 77 Cal.Rptr.2d 107, 959 P.2d 265.)[3]
There, we took what we referred to as a "literal" approach to the provision imposing on the insurer the duty to defend the insured in a "suit seeking damages." (Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra, 18 Cal.4th at p. 869, 77 Cal.Rptr.2d 107, 959 P.2d 265.) In doing so, we considered the provision in its full context; we proceeded to find, in effect, that it was clear in its limitation to a civil action prosecuted in a court, and that, in such limitation, it did not run counter to the hypothetical insured's objectively reasonable expectations. (Id. at pp. 869-871, 878-888, 77 Cal.Rptr.2d 107, 959 P.2d 265.) We declined to take either a "functional" or a "hybrid" approach (id. at p. 869, 77 Cal.Rptr.2d 107, 959 P.2d 265), each of which treats the provision as "ambiguous" (id. at p. 872, 77 Cal.Rptr.2d 107, 959 P.2d 265), the former deeming "suit" to reach anything that is equivalent to a suit, apparently without qualification (id. at p. 871 & pp. 871-872, fn. 7, 77 Cal.Rptr.2d 107, 959 P.2d 265), the latter deeming "suit" to reach anything that is equivalent to a suit, but "only if it is sufficiently coercive and threatening" (id. at pp. 871-872 & p. 872, fn. 8, 77 Cal.Rptr.2d 107, 959 P.2d 265). We declined to take either approach because the duty to defend involved a "suit," and not something equivalent to a suit or even something equivalent to a suit that was sufficiently coercive and threatening. (Id. at pp. 872, 879, 77 Cal.Rptr.2d 107, 959 P.2d 265.) We impliedly recognized that the provision could have imposed a duty to defend without any limitation to a "suit," thereby "creat[ing] `a broad legal-services arrangement under which [the] insurer[ ] would step into any dispute'" involving the insured. (Id. at p. 881, 77 Cal.Rptr.2d 107, 959 P.2d 265.) But we also impliedly recognized that the provision did not in fact impose such an unlimited duty. (Id. at p. 882, 77 Cal.Rptr.2d 107, 959 P.2d 265.) We observed that the provision, under our reading, commended itself to society generally as laying down a "`bright-line rule that ... reduces the need for future litigation.'" (Id. at p. 887, 77 Cal.Rptr.2d 107, 959 P.2d 265, italics omitted.)
*682 In light of the foregoing, we went on to conclude that the insurer's duty to defend the insured did not extend to a proceeding conducted before an administrative agency pursuant to an environmental statutespecifically, there, a proceeding conducted before the Department of Toxic Substances Control pursuant to the Carpenter-Presley-Tanner Hazardous Substance Account Act. (Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra, 18 Cal.4th at pp. 878-888, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Our reason was that a proceeding conducted before an administrative agency pursuant to an environmental statute does not constitute a "suit," i.e., a civil action prosecuted in a court, but rather implicates a "claim." (Ibid.) We did not ignore the fact that such a proceeding might ripen into such an action. (Id. at pp. 878-879, 881, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Neither did we ignore the fact that the course and outcome of such a proceeding might affect the course and outcome of such an action, to the agency's benefit and its subject's detriment. (Id. at pp. 881, 882-883, 887, 77 Cal.Rptr.2d 107, 959 P.2d 265.) But we simply could not ignore the fact that such a proceeding does not itself amount to such an actiona fact that the Carpenter-Presley-Tanner Hazardous Substance Account Act itself reflected by distinguishing the former from the latter. (Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra, 18 Cal.4th at pp. 878-879, 881, 884-885, 77 Cal.Rptr.2d 107, 959 P.2d 265.)
In arriving at our conclusion, we declined to rewrite the provision imposing the duty to defend in order to remove its limitation to a civil action prosecuted in a court. (Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra, 18 Cal.4th at pp. 886-888, 77 Cal.Rptr.2d 107, 959 P.2d 265.) We would not do so for the insured itself, in order to shift to the insurer some or all of the potentially substantial costs that might be imposed on the insured in the course of a proceeding conducted before an administrative agency pursuant to an environmental statute. (Id. at pp. 886-887, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Neither would we do so for considerations of public policy, in order, perhaps, to bring such a proceeding to a timely and appropriate outcome through such a shifting of costs. (Id. at p. 888, 77 Cal.Rptr.2d 107, 959 P.2d 265.) Our reason was that we do not rewrite any provision of any contract, including the standard policy underlying any individual policy, for any purpose. (Ibid.)

E
Proceeding from Foster-Gardner to this case, we believe that the insurer's duty to indemnify the insured for "all sums that the insured becomes legally obligated to pay as damages" under the standard comprehensive general liability insurance policy is limited to money ordered by a court.
Our belief about the duty to indemnify and its limitation to money ordered by a court is sufficiently supported when we look to what we may call Foster-Gardner's "syllogism" alone.
The duty to defend is broader than the duty to indemnify. The duty to defend is not broad enough to extend beyond a "suit," i.e., a civil action prosecuted in a court, but rather is limited thereto. A fortiori, the duty to indemnify is not broad enough to extend beyond "damages," i.e., money ordered by a court, but rather is limited thereto. "It is ... well settled that because the duty to defend is broader than the duty to indemnify," a determination that "there is no duty to defend automatically means that there is no duty to indemnify." (State of N.Y. v. Blank (N.D.N.Y. 1990) 745 F.Supp. 841, 844 [applying New York law], affd. (2d Cir.1994) 27 F.3d 783; accord, Boyce Thompson Institute v. Insurance Co. of N.A. (S.D.N.Y.1990) 751 F.Supp. 1137, 1144 [following Blank ]; Fruit of the Loom v. Travelers Indemnity (1996) 284 Ill.App.3d 485, 500, 219 Ill.Dec. 770, 672 N.E.2d 278 [holding that, "[i]n cases where no duty to defend exists, there *683 is no duty to indemnify since the duty to defend is broader than the duty to indemnify"].)
Our belief about the duty to indemnify and its limitation to money ordered by a court is definitively confirmed when we look beyond Foster-Gardner's syllogism.
In its language, especially "damages," the provision imposing the duty to indemnify is clear in its limitation to money ordered by a court.
The full context of the provision imposing the duty to indemnify includes, under the narrower focus, the standard policy itself and particularly the provision imposing the duty to defend and, under the wider focus, the standard policy within the "legal ... culture" of the judicial sphere and the "broader culture" of the world at large (Kopp v. Fair Pol. Practices Com. (1995) 11 Cal.4th 607, 673, 47 Cal.Rptr.2d 108, 905 P.2d 1248 (cone. opn. of Mosk, J.)).
The narrower focus on the standard policy itself reveals that the duty to indemnify is limited to money ordered by a court.
Recall that the provision imposing the duty to defend, which may arise as soon as damages are sought in some amount, generally states that the insurer has a "duty to defend" the insured "in any suit seeking damages" for harm alleged within coverage.
Recall further that the provision imposing the duty to indemnify, which can arise only after damages are fixed in their amount, generally states that the insurer "will pay all sums that the insured becomes legally obligated to pay as damages" for harm proved within coverage.
The provision imposing the duty to defend expressly links "damages" to a "suit," i.e., a civil action prosecuted in a court. For it is in a "suit" that "damages" are sought in some amount through the court's order.
The provision imposing the duty to indemnify impliedly links "damages" to a "suit," i.e., a civil action prosecuted in a court. For it is in a "suit" that "damages" are fixed in their amount through the court's order.[4]
The wider focus on the standard policy within the legal and broader culture also reveals that the duty to indemnify is limited to money ordered by a court.
The duty to indemnify runs to "all sums that the insured becomes legally obligated to pay as damages."
"Damages" exist traditionally inside of court. (See, e.g., McHugh v. Santa Monica Rent Control Bd. (1989) 49 Cal.3d 348, 355-386, 261 Cal.Rptr. 318, 777 P.2d 91; McCormick, Handbook on the Law of Damages (1935) pp. 1-3; see also, e.g., Curtis v. Loether (1974) 415 U.S. 189, 196, 94 S.Ct. 1005, 39 L.Ed.2d 260; Walnut *684 Creek Manor v. Fair Employment & Housing Com. (1991) 54 Cal.3d 245, 262, 284 Cal.Rptr. 718, 814 P.2d 704; Civ.Code, §§ 3281-3283; Black's Law Diet. (7th ed.1999) p. 393, col. 2; 1 Bouvier's Law Diet. (8th ed.1914) pp. 749-753; Webster's 3d New Internat. Diet. (1961) p. 571, col. 3; Webster's 2d New Internat. Diet. (1941) p. 664, col. 3.)
For its part, "harm" exists traditionally outside of court. (See, e.g., Civ.Code, §§ 3281-3283; Black's Law Diet., supra, at p. 393, col. 2; 1 Bouvier's Law Diet., supra, at pp. 749-753; Webster's 3d New Internat. Diet., supra, at p. 571, col. 3; Webster's 2d New Internat. Diet., supra, at p. 664, col. 3.)
"Damages" and "harm" are related the one to the other: "Harm" outside of court may result in "damages" inside of court, and "damages" inside of court result from "harm" outside of court. (See, e.g., Civ. Code, §§ 3281-3283; Black's Law Diet., supra, at p. 393, col. 2; 1 Bouvier's Law Diet., supra, at pp. 749-753; Webster's 3d New Internat. Diet., supra, at p. 571, col. 3; Webster's 2d New Internat. Dict., supra, at p. 664, col. 3; cf. Civ.Code, § 3287 [implying that a "person" becomes "entitled" to "recover" or "receive" "damages" as a result of harm outside of court, but actually "recover[s]" or "receive[s]" such "damages" inside of court]; id., § 3288 [consistent therewith].)
Again, the duty to indemnify runs to "all sums that the insured becomes legally obligated to pay as damages."
To be sure, one might speak of a "sum that the insured becomes legally obligated to pay" simpliciteromitting "as damages"apart from any order by a court. For one might say that the insured is legally obligated to pay some such sum under abstract legal rules alone. Thus, one might say that a driver of an automobile is legally obligated to comply with all laws relating to use of the roads apart from any order by a court. One might also say that the driver is legally obligated to pay the toll required by such laws for passage over a designated bridge apart from any such order.
But one would not speak of any "sum that the insured becomes legally obligated to pay as damages" apart from, any order by a court.[5] For one would not say that the insured is legally obligated to pay some such sum as damages under abstract rules alone. That is because, as a sum that the insured becomes legally obligated to pay, "damages" presuppose an institution for their ordering, traditionally a court, albeit no longer exclusively. (See, e.g., McHugh v. Santa Monica Rent Control Bd., supra, 49 Cal.3d at pp. 355-386, 261 Cal.Rptr. 318, 777 P.2d 91; McCormick, Handbook on the Law of Damages, supra, at pp. 1-3; see also Curtis v. Loether, supra, 415 U.S. at p. 196, 94 S.Ct. 1005; Walnut Creek Manor v. Fair Employment & Housing Com., supra, 54 Cal.3d at p. 262, 284 Cal.Rptr. 718, 814 P.2d 704.) "Damages" do not constitute a redundancy to a "sum that the insured becomes legally obligated to pay," but a limitation thereof. Thus, again, one might say that a driver of an automobile is legally obligated to comply with all laws relating to use of the roads apart from any order by a court. And, again, one might say that the driver is legally obligated to pay the toll required by such laws for passage over a designated bridge apart from any such order. But one would not say that the driver is legally obligated to pay any sum as a fine for failure to do so apart from any such order.
Consequently, the insurer's duty to indemnify the insured for "all sums that the insured becomes legally obligated to pay as damages" is limited to money ordered by a court. It does not extend to all sums, or even any sum, that the insured becomes legally obligated to pay other than as damages. *685 Surely not to all sums, or even any sum, that the insured may be said to become legally obligated to pay as a result of harm.[6]
In concluding that the duty to indemnify is limited to money ordered by a court, we do not, to quote AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 840, 274 Cal. Rptr. 820, 799 P.2d 1253 (hereafter sometimes AIU), "exalt form over substance." Rather, we do no more, and no less, than declare what we have determined to be the duty's substance.
We observe that other courts are in accord with our conclusion that the duty to indemnify is limited to money ordered by a court.[7]
We are not unaware, however, that yet other courts are contra.[8] Neither are we unaware that such other courts are more numerous. Their number, however, adds nothing to their weight. If we look at their decisions in accordance with the framework of Foster-Gardner, we find their weight insubstantial. They have taken what we there referred to as either a "functional" or a "hybrid" approach, instead of a "literal" one. Expressly or impliedly, they have treated the provision imposing the duty to indemnify as "ambiguous," those taking a "functional" approach deeming "damages" to reach anything that is equivalent to damages, those taking a "hybrid" approach deeming "damages" to reach anything that is equivalent to damages if it is sufficiently significant. We put aside any question whether our taking of a "literal" approach to the duty to defend in Foster-Gardner compels our taking of a like approach to the duty to indemnify in this case. Our words there, however, may be modified to apply here as well: The duty to indemnify involves "damages," clearly so, and not something equivalent to damages or even something equivalent to damages that is sufficiently significant. *686 But, even if we do not look at the decisions of these courts in accordance with the framework of Foster-Gardner, we still find their weight insubstantial. For, whether their discussion fills many pages or amounts only to a few words, they have each failed to consider the provision imposing the duty to indemnify in its full context. Because of their failure, whatever discussion they set forth proves lacking in persuasive force.
We recognize that the provision imposing the duty to indemnify could have done so without any limitation to money ordered by a court. In that event, it would have created a broad financial-subsidy arrangement under which the insurer would "pay any sum that the insured becomes legally obligated to pay."
But we also recognize that the provision imposing the duty to indemnify does in fact do so with a limitation to money ordered by a court. We cannot, and will not, act as if it did not.
In its limitation to money ordered by a court, the provision imposing the duty to indemnify commends itself to society generally as laying down a bright-line rule. It has a tendency to promote fairness and efficiency in the judicial sphere. By increasing certainty and decreasing uncertainty about the duty to indemnify, it serves to deter some litigation on the issue and to conclude what it does not deter expeditiously and soundly.
In light of the foregoing, we believe that the duty to indemnify does not extend to any expenses required by an administrative agency pursuant to an environmental statutespecifically, here, proceedings conducted before the Regional Water Boards pursuant to the Porter-Cologne Act. Our reason is that expenses required by an administrative agency pursuant to an environmental statute, whether for the cleanup of a contaminated site and the abatement of the contamination's effects or otherwise, do not constitute money ordered by a court. We do not ignore the fact that such expenses and such money are measured in precisely the same terms of dollars and cents. Neither do we ignore the fact that the furnishing of such expenses might altogether obviate the payment of such money. But we simply cannot ignore the fact that such expenses do not amount to such moneya fact that the Porter-Cologne Act itself reflects by distinguishing the former from the latter. (See Wat.Code, § 13304.)
Not to the contrary is AIU. There, we held to the effect that the duty to indemnify may embrace all money ordered by a court, including "money that the insured must give under law as compensation to third parties" and also "money that the insured must itself expend in equity in order to provide relief of the same sort." (Aerojet-General Corp. v. Transport Indemnity Co., supra, 17 Cal.4th at p. 56, 70 Cal.Rptr.2d 118, 948 P.2d 909 [citing AIU].) We did not hold that the duty extends to any money in addition to that ordered by a courtincluding any expenses required by an administrative agency pursuant to an environmental statute. Indeed, we did not even consider the issue.
Neither is Vandenberg v. Superior Court (1999) 21 Cal.4th 815, 88 Cal.Rptr.2d 366, 982 P.2d 229 to the contrary. There, we held to the effect that the duty to indemnify may embrace all money ordered by a court, including money ordered by a court under the law of torts and, in some cases, money ordered by a court under the law of contracts. (Id. at pp. 838-841, 88 Cal.Rptr.2d 366, 982 P.2d 229.) Again, we did not hold that the duty extends to any money in addition to that ordered by a courtincluding any expenses required by an administrative agency pursuant to an environmental statute. Indeed, we implied the opposite, albeit only in dictum, stating to the effect that the duty depends on a legal obligation to pay a sum as damages, which depends in turn on "liability imposed in a definite sum by a final judgment...." *687 (Id. at p. 839, 88 Cal.Rptr.2d 366, 982 P.2d 229.)
Also not to the contrary is Foster-Gardner itself. There, we stated as follows: "[B]ecause we conclude the insurers here did not contract and receive premiums to defend anything but a civil lawsuit, requiring them to defend [a proceeding conducted before the Department of Toxic Substances Control pursuant to the Carpenter-Presley-Tanner Hazardous Substance Account Act] would result in an unintended windfall for Foster-Gardner. Moreover, it is indeed arguable that an insured's early intervention in a dispute outside the civil action context may reduce any indemnity for which the insurer is ultimately held liable. That does not alter the scope of the insurer's duty to defend. Thus, even if Foster-Gardner is correct that its insurers will ultimately be obligated to indemnify costs incurred as a result of the [proceeding in question], this merely means that the insurers have an inherent incentive to participate in [the] proceeding[ ] where the costs are ascertained. Under the language of the policy, however, this is a judgment call left solely to the insurer (`the company ... may make such ... settlement of any claim ... as it deems expedient'). [Citations.] In any event, ... `this anomaly is more imagined than real since insurance companies routinely pay "claims" that have not ripened into "suits" and which therefore have not triggered a defense obligation.'" (Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra, 18 Cal.4th at p. 883, 77 Cal. Rptr.2d 107, 959 P.2d 265, first and third ellipses in parenthetical in Foster-Gardner.) In so stating, we assumed that, as a general matter, a "dispute outside the civil action context" in the form of a "claim" involving the insured in a proceeding conducted before an administrative agency pursuant to an environmental statute may ripen into a "dispute" within that "context" in the form of a "suit," in which the insurer may "ultimately [be] held liable" for "indemnity." We also assumed, more specifically, that Foster-Gardner's "insurers" might "ultimately be obligated to indemnify costs incurred as a result of the" proceeding in question if it passed from "claim" to "suit." But we did not hold that the duty to indemnify extends to any money in addition to that ordered by a court including any expenses required by an administrative agency pursuant to an environmental statute.
In arriving at our conclusion, we decline to rewrite the provision imposing the duty to indemnify in order to remove its limitation to money ordered by a court. We will not do so for the insured itself, in order to shift to the insurer some or all of the potentially substantial costs that might be imposed on the insured as the outcome of a proceeding conducted before an administrative agency pursuant to an environmental statute. Neither will we do so for considerations of public policy, in order, perhaps, to promote the outcome itself through such a shifting of costsfor example, to advance the cleanup of a contaminated site and the abatement of the contamination's effects by calling in the insurer's resources in supplement to those of an insured that is prosperous or in place of those of an insured that is not. Our reason is that we do not rewrite any provision of any contract, including the standard policy underlying any individual policy, for any purpose. (See Aerojet-General Corp. v. Transport Indemnity Co., supra, 17 Cal.4th at pp. 75-76, 70 Cal. Rptr.2d 118, 948 P.2d 909.) To do so with regard to the standard policy, with which we are here concerned, might have untoward effects generally on individual insurers and individual insureds and also on society itself. Through the standard policy, individual insurers made promises, and individual insureds paid premiums, against the risk of loss. To rewrite the provision imposing the duty to indemnify in order to remove its limitation to money ordered by a court might compel insurers to give more than they promised and might allow insureds to get more than they paid for, *688 thereby denying their "general[] free[dom] to contract as they please[]" of any effect in the matter. (Id. at p. 75, 70 Cal.Rptr.2d 118, 948 P.2d 909; accord, Linnastruth v. Mut. Benefit etc. Assn. (1943) 22 Cal.2d 216, 218, 137 P.2d 833.) It is conceivable that to rewrite the provision thus might result in providing society itself with benefits that might outweigh any costs that it might impose on individual insurers and individual insureds. It is conceivable. But unknown. Knowledge "depend[s] in large part on" what we are ill suited for, that is, the "amassing and analyzing of complex and extensive empirical data." (Aerojet-General Corp. v. Transport Indemnity Co., supra, 17 Cal.4th at p. 76, 70 Cal.Rptr.2d 118, 948 P.2d 909.) Without such knowledge, we could not proceed.
Against our determinations, Powerine presents a number of arguments. None proves persuasive.
As to Foster-Gardner's syllogism, Powerine argues that, even if the duty to defend is broader than the duty to indemnify, it does not follow that a determination that "there is no duty to defend automatically means that there is no duty to indemnify." (State of N.Y. v. Blank, supra, 745 F.Supp. at p. 844, italics added.) To the extent that Powerine suggests that the absence of a duty to defend does not necessarily entail the absence of a duty to indemnify under some possible comprehensive general liability insurance policy, it is surely right. But it is just as surely wrong to the extent that it asserts that the absence of a duty to defend does not actually entail the absence of a duty to indemnify under the standard comprehensive general liability insurance policy. For under the standard policy, if not under some individual one, this is the case: If the duty to defend does not arise because "damages" are not sought in any amount in a "suit," i.e., a civil action prosecuted in a court, then the duty to indemnify cannot arise because "damages," i.e., money ordered by a court, cannot be fixed in their amount since they have not been sought in the first place. (Cf. Ryan v. Royal Ins. Co. of America, supra, 916 F.2d at p. 743 [holding that, if there is no "suit," there cannot be any "damages"].)
As to our holding that the duty to indemnify is limited to money ordered by a court, Powerine argues that we should read the provision imposing the duty to indemnify, in spite of its limitation to money ordered by a court, to extend to expenses required by an administrative agency pursuant to an environmental statute. It invokes section 1644 of the Civil Code: "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed."
By its terms, however, Civil Code section 1644 seems more applicable to an individual policy, which constitutes a contract reflecting the "actual agreement between a given insurer and a given insured" (Buss v. Superior Court, supra, 16 Cal.4th at p. 45, 65 Cal.Rptr.2d 366, 939 P.2d 766), than to the standard policy, which does not (ibid.).
But even if we apply Civil Code section 1644 to the standard policy, we read the provision imposing the duty to indemnify, in the "ordinary and popular sense" of its "words" rather than according to any "strict legal meaning" (ibid.), to be limited to money ordered by a court, and not to extend to expenses required by an administrative agency pursuant to an environmental statute. We do so because we consider the provision, as we must, in its full context. As stated, in both the legal and the broader culture, "damages" exist traditionally inside of court. True it is, "damages" have begun to appear in some administrative agencies, albeit only relatively lately and relatively infrequently. (See generally Walnut Creek Manor v. Fair Employment & Housing Com., supra, 54 Cal.3d at pp. 255-273, 284 Cal. Rptr. 718, 814 P.2d 704; McHugh v. Santa *689 Monica Rent Control Bd., supra, 49 Cal.3d at pp. 355-386, 261 Cal.Rptr. 318, 777 P.2d 91.) But, within the standard policy, "damages" exist solely inside of court, especially in light of their linkage therein to a "suit," i.e., a civil action prosecuted in a court. The provision imposing the duty to defend expressly links "damages" to a "suit," because it is in a "suit" that "damages" are sought in some amount through the court's order. The provision imposing the duty to indemnify impliedly links "damages" to a "suit," because it is in a "suit" that "damages" are fixed in their amount through such order.[9]
That the provision imposing the duty to indemnify happens to be limited to money ordered by a court more impliedly than expressly is of no consequence. An implied limitation is sufficient; an express limitation is not necessary.[10] Neither is it of any consequence that the provision imposing the duty to indemnify with its more implied than express limitation might be less "conspicuous, plain and clear" (Steven v. Fidelity & Casualty Co. (1962) 58 Cal.2d 862, 878, 27 Cal.Rptr. 172, 377 P.2d 284; accord, State Farm Mut. Auto. Ins. Co. v. Jacober (1973) 10 Cal.3d 193, 202, 110 Cal.Rptr. 1, 514 P.2d 953) than it would have been with a more express than implied limitation. It is an exclusionary provision, however, that is said to require "conspicuousness," "plainness," and "clarity." (State Farm Mut. Auto. Ins. Co. v. Jacober, supra, 10 Cal.3d at p. 202, 110 Cal.Rptr. 1, 514 P.2d 953.) The provision imposing the duty to indemnify is simply not such: It does not exclude anything or anyone from the scope of the duty to indemnify, but merely defines the duty's scope in the first place. With that said, it is nevertheless adequately conspicuous, plain, and clear.
Powerine also argues that we should read the provision imposing the duty to indemnify, in spite of its limitation to money ordered by a court, to extend to expenses required by an administrative agency pursuant to an environmental statute, in light of, inter alia, Isaacson v. California Ins. Guarantee Assn. (1988) 44 Cal.3d 775, 244 Cal.Rptr. 655, 750 P.2d 297, and Lamb v. Belt Casualty Co. (1935) 3 Cal.App.2d 624, 40 P.2d 311.
But neither Isaacson nor Lamb supports such a reading of the provision imposing the duty to indemnify. For neither supports a reading of the provision without any limitation to money ordered by a court. Rather, each stands, at most, for the proposition that, when an insurer breaches one of its duties, the insured may recover damages for harm arising therefrom, including an amount that it paid a third party in settlement. (See Isaacson v. California Ins. Guarantee Assn., supra, 44 Cal.3d at pp. 791-792, 244 Cal.Rptr. 655, 750 P.2d 297; Lamb v. Belt Casualty Co., supra, 3 Cal.App.2d at pp. 630-632, 40 P.2d 311.)
Powerine then argues to the effect that we should rewrite the provision imposing the duty to indemnify in order to remove its limitation to money ordered by a court. Its basis appears to be this: The limitation gives the insured a deterrent against compromise and an incentive toward litigation, and accordingly conflicts generally with the public policy in favor of settlement, which encourages compromise and discourages litigation, and specifically with the public policy underlying various environmental *690 statutes, including those cited above, which gives the subject of a proceeding before the administrative agency in question an incentive toward compromise and a deterrent against litigation.
But, as we have explained, not even for considerations of public policy would we rewrite the provision imposing the duty to indemnify in order to remove its limitation to money ordered by a court. In any event, such considerations seem hardly substantial. In spite of the limitation from all that appears both generally and specifically with regard to proceedings conducted before administrative agencies pursuant to environmental statutescompromise is regularly achieved, and litigation is regularly avoided. Recall that, in the same provision in which it imposes on the insurer a duty to defend the insured, the standard policy grants the insurer a right to settle any at least potentially covered dispute involving the insured. We may infer that, in a "large percentage" of such disputes, insurers exercise their right. (Comunale v. Traders & General Ins. Co. (1958) 50 Cal.2d 654, 659, 328 P.2d 198; accord, e.g., Commercial Union Assurance Companies v. Safeway Stores, Inc. (1980) 26 Cal.3d 912, 917, 164 Cal. Rptr. 709, 610 P.2d 1038 (by the court).) That is because we know that, in a "large percentage" of such disputes, they in fact achieve compromise and avoid litigation. (Comunale v. Traders & General Ins. Co., supra, 50 Cal.2d at p. 659, 328 P.2d 198; accord, e.g., Commercial Union Assurance Companies v. Safeway Stores, Inc., supra, 26 Cal.3d at p. 917, 164 Cal.Rptr. 709, 610 P.2d 1038 (by the court).)
We arrive at our conclusion not unaware that other courts have held or stated, in terms or in effect, that the duty to indemnify is not limited to money ordered by a court, but may extend to expenses required by an administrative agency pursuant to an environmental statute.[11] For the reasons that we have stated, we cannot, and will not, follow.[12]

III
We turn now to the decision of the Court of Appeal, which ordered issuance of a peremptory writ of mandate directing the superior court to vacate its order denying the London Insurers' motion for summary adjudication of the issue of their duty to indemnify Powerine under their comprehensive general liability and other insurance policies, and to make a new order granting what they sought.
At the threshold, we believe that the Court of Appeal was right to subject to independent review the superior court's order denying summary adjudication of the issue of the London Insurers' duty to indemnify. A ruling denying summary adjudication *691 is so scrutinized. (E.g., Travelers Casualty & Surety Co. v. Superior Court (1998) 63 Cal.App.4th 1440, 1450, 75 Cal.Rptr.2d 54.) It resolves a pure question of law (ibid.), namely, whether there is any triable issue as to any material fact and, if not, whether the moving party is entitled to adjudication in his favor as a matter of law (Code Civ. Proc., § 437c, subds. (c) & (f)). The same is true of a ruling granting summary adjudication. (E.g., Maxconn Inc. v. Truck Ins. Exchange (1999) 74 Cal.App.4th 1267, 1272, 88 Cal.Rptr.2d 750; Casey v. Overhead Door Corp. (1999) 74 Cal.App.4th 112, 118, 87 Cal.Rptr.2d 603.)
On the merits, we believe that the Court of Appeal was also right to direct the superior court to vacate its order denying summary adjudication of the issue of the London Insurers' duty to indemnify and to make a new order granting summary adjudication thereof.
A trial court's ruling on a motion for summary adjudication, like that of the London Insurers on the issue of their duty to indemnify Powerine, entails a determination whether there is any triable issue as to any material fact, and, if not, whether the moving party is entitled as a matter of law to an adjudication that it does not owe any such duty. (Code Civ. Proc., § 437c, subds. (c) & (f).)
The Court of Appeal concluded that policy No. LAB 2579, the comprehensive general liability insurance policy for the term from May 1, 1958, to May 1, 1961, imposes on the London Insurers a duty to indemnify Powerine that is limited to money ordered by a court, and does not extend to any expenses required by an administrative agency, like the Regional Water Boards, pursuant to an environmental statute, like the Porter-Cologne Act.
We agree.
Policy No. LAB 2579 imposes on the London Insurers a duty to indemnify Powerine with language like that of the standard policy, stating that the "Underwriters" "[d]o hereby agree with the Assured" "[t]o pay on behalf of the Assured all sums which the Assured shall become legally obligated to pay as damages" for harm proved within coverage, "irrespective of whether such damages are imposed by law or assumed under contract."
Policy No. LAB 2579 also imposes on the London Insurers a duty to defend Powerine with language like that of the standard policy, stating that the "Underwriters shall" "[d]efend in his name and behalf any suit against the Assured arising out of harm "alleg[ed]" within coverage "and seeking damages on account thereof or seeking damages by reason of a contract under which the Assured assumed or is alleged to have assumed liability of others therefor...."
That the duty to indemnify under policy No. LAB 2579 is limited to money ordered by a court is supported by Foster-Gardner's syllogism. The syllogism here is not predicated on any assumption that the absence of a duty to defend necessarily entails the absence of a duty to indemnify under some possible policy of comprehensive general liability insurance. It is predicated, instead, on the fact that the absence of a duty to defend actually entails the absence of a duty to indemnify under this individual policy of comprehensive general liability insurance.
That the duty to indemnify under policy No. LAB 2579 is limited to money ordered by a court is confirmed by the full context of the provision imposing the duty, with its language referring to "damages." The wider focus on the policy within the legal and broader culture reveals, as stated, that "damages" exist traditionally inside of court. The narrower focus on the policy itself reveals this: The provision imposing the duty to defend expressly links "damages" to a "suit," because it is in a "suit" that "damages" are sought in some amount through the court's order. The provision imposing the duty to indemnify impliedly links "damages" to a "suit," because it is in a "suit" that "damages" are fixed in their amount through such order. That it declares itself applicable "irrespective of *692 whether such damages are imposed by law or assumed under contract" is not to the contrary, merely recognizing as it does that the "Assured" may find itself responsible for the underlying harm through its own tortious conduct or through its agreement to "indemnify" or "hold" another "harmless" for the other's tortious conduct (see Old Republic Ins. Co. v. Superior Court (1998) 66 Cal.App.4th 128, 146-147, 77 Cal.Rptr.2d 642, disapproved on another point, Vandenberg v. Superior Court, supra, 21 Cal.4th at p. 841, fn. 13, 88 Cal.Rptr.2d 366, 982 P.2d 229; Loyola Marymount University v. Hartford Accident & Indemnity Co. (1990) 219 Cal. App.3d 1217, 1225-1226, 271 Cal.Rptr. 528).[13]
The language of the provision in policy No. LAB 2579 imposing the duty to indemnify is not at all unclear in its limitation to money ordered by a court.[14] Even if it were, it could not reasonably be read to extend to any expenses required by an administrative agency, like the Regional Water Boards, pursuant to an environmental statute, like the Porter-Cologne Act. One may assume that, at the time of the issuance of the policy in 1958, both the London Insurers and Powerine were acquainted with administrative agencies and environmental statutesalthough one could not contend that either could have foreseen the creation of administrative agencies like these agencies, which constitute a new kind of entity, or the enactment of environmental statutes like this statute, which constitutes a new kind of measure (see AIU Ins. Co. v. Superior Court, supra, 51 Cal.3d at p. 822, fn. 8, 274 Cal.Rptr. 820, 799 P.2d 1253). Even if the language of the provision imposing the duty to indemnify were, in fact, unclear in its limitation to money ordered by a court, there is simply no basis to conjecture that the London Insurers believed that Powerine understood the words to extend to any expenses required by an administrative agency pursuant to an environmental statute, whether the agency or the statute was new or otherwise. Likewise, even if this language were, in fact, unclear in this regard, there is simply no basis to speculate that Powerine had objectively reasonable expectationsor indeed any expectations whatsoeverthat the words extended so far.[15]

IV
For the reasons stated above, we must affirm the judgment of the Court of Appeal.
It is so ordered.
GEORGE, C.J, BAXTER, J., CHIN, J., and BROWN, J., concur.
*693 Dissenting Opinion by KENNARD, J.
I dissent.
The majority holds that standard language in a comprehensive general liability (CGL) insurance policy, under which the liability carrier promises to indemnify the insured for "all sums that the insured becomes legally obligated to pay as damages," does not obligate the carrier to pay the costs of complying with an administrative order to mitigate and remediate the effects of environmental pollution. I would hold that it does.
The issue presented here is logically related to two earlier decisions of this court that also dealt with the subject of insurance coverage under CGL policies in the context of enforcement proceedings under state and federal environmental protection laws. In AIU Ins. Co. v. Superior Court (1990) 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253 (AIU ), this court held that when the government recovers or imposes environmental pollution remediation costs in a civil suit, those costs are, in the words of the standard CGL policy, sums that the insured is "legally obligated to pay as damages." (Id. at pp. 837, 841, 274 Cal.Rptr. 820, 799 P.2d 1253.) I joined in that decision, which was unanimous. In Foster-Gardner, Inc. v. National Union Fire Ins. Co. (1998) 18 Cal.4th 857, 77 Cal.Rptr.2d 107, 959 P.2d 265 (Foster-Gardner), a bare majority of this court held that an administrative agency notice identifying the recipient as a party potentially responsible for environmental pollution, and directing the recipient to assume responsibility for remediation of the pollution, does not trigger the duty of defense under a standard CGL policy issued to the recipient. (Id. at pp. 881-882, 77 Cal.Rptr.2d 107, 959 P.2d 265.) In a dissenting opinion joined by Justices Mosk and Werdegar, I disagreed with that holding. (Id. at p. 888, 77 Cal. Rptr.2d 107, 959 P.2d 265 (dis. opn. of Kennard, J.).)
Had this court adopted the reasoning and conclusion of the dissent in Foster-Gardner, supra, 18 Cal.4th 857, 888, 77 Cal.Rptr.2d 107, 959 P.2d 265, there would be little room for argument about the proper resolution of the issue presented here. In other jurisdictions where coercive administrative proceedings under state or federal environmental laws have been held to trigger a carrier's defense obligation under a standard CGL policy, invariably the courts have held also that administrative cleanup orders trigger a CGL carrier's duty to indemnify. (See, e.g., Coakley v. Maine Bonding and Cas. Co. (1992) 136 N.H. 402, 618 A.2d 777; Spangler Const, v. Indus. Crankshaft (1990) 326 N.C. 133, 388 S.E.2d 557.)
But the converse is not equally true. One may accept the majority decision in Foster-Gardner as binding precedent and yet conclude that a CGL insurance carrier has a duty to indemnify its insured for the costs of complying with an administrative cleanup order. Indeed, the rules of insurance policy construction articulated in Foster-Gardner and in AIU strongly favor this conclusion. (See Foster-Gardner, supra, 18 Cal.4th at pp. 868-869, 77 Cal. Rptr.2d 107, 959 P.2d 265; AIU, supra, 51 Cal.3d at pp. 821-822, 274 Cal.Rptr. 820, 799 P.2d 1253.)
Because an insurance policy is a contract, the mutual intention of the parties at the time the contract was formed controls the meaning of its terms. (Foster-Gardner, supra, 18 Cal.4th at p. 868, 77 Cal. Rptr.2d 107, 959 P.2d 265; AIU, supra, 51 Cal.3d at pp. 821-822, 274 Cal.Rptr. 820, 799 P.2d 1253.) "Such intent is to be inferred, if possible, solely from the written provisions of the contract. ([Civ. Code], § 1639.) The `clear and explicit' meaning of these provisions, interpreted in their `ordinary and popular sense,' unless `used by the parties in a technical sense or a special meaning is given to them by usage' (id., § 1644), controls judicial interpretation. (Id., § 1638.) Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.] [¶] If there is *694 ambiguity, however, it is resolved by interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promisee understood them at the time of formation. (Civ. Code, § 1649.)" (AIU, supra, at p. 822, 274 Cal. Rptr. 820, 799 P.2d 1253; see also Foster-Gardner, supra, at p. 868, 77 Cal.Rptr.2d 107, 959 P.2d 265.)
Here, the policy language to be construed under these rules obligates the carrier to indemnify the insured for "all sums that the insured becomes legally obligated to pay as damages." The majority does not dispute that an insured is "legally obligated" to comply with an administrative cleanup order to remediate environmental pollution. (See maj. opn., ante, 103 Cal. Rptr.2d at p. 683, 16 P.3d at p. 104.) But the majority insists that money paid in compliance with an administrative cleanup order is not "damages" because "damages" are only "money ordered by a court." (Maj. opn., ante, at p. 684, 16 P.3d at p. 105.) In defense of this notion that only a court may award damages, the majority relies heavily on Foster-Gardner, supra, 18 Cal.4th 857, 77 Cal.Rptr.2d 107, 959 P.2d 265, in which this court concluded that the term "suit" in the CGL policy provision defining the duty to defend refers only to a judicial proceeding.
The principal flaw in this analysis is that the term "suit" nowhere appears in the CGL policy's indemnity provision. The majority dismisses this objection by postulating that "[t]he provision imposing the duty to indemnify impliedly links `damages' to a `suit,' i.e, a civil action prosecuted in a court." (Maj. opn, ante, 103 Cal.Rptr.2d at p. 683,16 P.3d at p. 104, italics added.) This implied link between the defense and indemnity provisions, insofar as it imposes a judicial proceeding limitation, is a legal fiction that the majority conjures from the void to fill the yawning gap in its analysis.
To justify its linkage of the term "suit" in the defense provision and the term "damages" in the indemnity provision, the majority states that "it is in a `suit' that `damages' are fixed in their amount through the court's order." (Maj. opn, ante, 103 Cal.Rptr.2d at p. 683, 16 P.3d at p. 104, fn. omitted.) But to say that a court may award "damages" in a civil "suit" in no way excludes the possibility that an administrative agency may also award "damages" by administrative order, just as the power of a court to issue a subpoena or hear testimony does not logically exclude administrative agencies from doing likewise. This court has frequently acknowledged that administrative agencies may award damages, provided they act with statutory authority and without violating the state Constitution's judicial powers clause. (See, e.g., Walnut Creek Manor v. Fair Employment & Housing Com. (1991) 54 Cal.3d 245, 255-256, 284 Cal. Rptr. 718, 814 P.2d 704.)
In AIU, this court construed the term "damages" as used in standard CGL indemnity provisions in a way that reveals the flaws in the majority's conclusion here that the term is inherently limited to judicial proceedings. There, this court summarized the basic concepts underlying various statutory and dictionary definitions of "damages": "Each [definition] requires there to be `compensation,' in `money,' `recovered' by a party for `loss' or `detriment' it has suffered through the acts of another." (AIU, supra, 51 Cal.3d 807, 826, 274 Cal.Rptr. 820, 799 P.2d 1253, fns. omitted.) Notably absent from this summary is the notion that damages are recoverable only through a judicial rather than an administrative proceeding. In AIU, this court concluded that "damages" included not only money recovered by an administrative agency as reimbursement for cleanup costs that the agency had paid, but also the costs of complying with remedial cleanup injunctions. (Id. at pp. 837, 841-842, 274 Cal.Rptr. 820, 799 P.2d 1253.) This court rejected a narrow construction of damages that "would make insurance coverage hinge on the `mere fortuity' of the way in which government agencies seek to enforce *695 cleanup requirements, would unreasonably constrain the agencies' choice of cleanup mechanisms, and would introduce substantial inefficiency into the cleanup process." (Id. at pp. 840-841, 274 Cal. Rptr. 820, 799 P.2d 1253.) And this court stressed that "an insured would reasonably expect equal coverage of the costs of equivalent or alternative remedies." (Id. at pp. 841-842, 274 Cal.Rptr. 820, 799 P.2d 1253.) Administrative cleanup orders and court injunctions are equivalent or alternative remedies for imposing pollution remediation costs, and an insured would reasonably expect equal coverage for both. The majority's limitation of "damages" to money ordered by a court makes coverage turn on the fortuity of the government agency's choice of enforcement mechanism; it is just the sort of rigid and formalistic definition this court rejected in AIU. Under the logic of AIU, therefore, the costs of complying with an administrative order are within the indemnity coverage of the standard CGL policy.
Further support for the conclusion that the parties to the CGL insurance agreement intended "damages" to include costs of complying with administrative cleanup orders is found in the circumstances of the issuance of the policies in this case, as Justice Aldrich explained in his dissenting opinion in the Court of Appeal. After noting that neither "suit" nor "judgment" appears in the indemnity provision of the policy at issue, which provided primary coverage, Justice Aldrich reasoned that the omission was persuasive evidence that the insurers, in drafting this policy, did not intend to indemnify only those damages awarded in a civil action or by a final judgment. Had they intended such limitations, the insurers could easily have agreed to pay on behalf of the insured, for example, "all sums that the insured becomes legally obligated by final judgment to pay as damages." The insurers did not do so in the primary policy.
Although language of this sort does not appear in the indemnity provision of the primary policy, it does appear in another CGL policy written and issued on the same day by the same carrier to the same insured. In this other policy, which provided excess coverage, the carrier promised to pay "all sums which the insured shall by law become liable to pay and shall pay or by final judgment be adjudged, to pay ... as damages...." (Italics added.) The italicized language in the excess policy shows that the insurer understood how to restrict the indemnity obligation to sums that the insured was required to pay as damages by final judgment (that is, sums ordered by a court in a civil action) when that was its intent. This limitation should not be read into a policy from which the insurer appears to have deliberately omitted it.
Moreover, as Justice Aldrich also pointed out, reliance on an "implied link" between provisions using markedly different language is inconsistent with Foster-Gardner's reasoning in contrasting the terms "suit" and "claim." The CGL policy at issue there required the insurers to defend a "suit," but gave them discretion to investigate and settle a "claim." (Foster-Gardner, supra, 18 Cal.4th at p. 878, 77 Cal. Rptr.2d 107, 959 P.2d 265.) This court reasoned that the use of these distinct terms "indicates that the insurers' differing rights and obligations with respect to `suits' and `claims' were deliberately and intentionally articulated in the policies." (Id. at p. 880, 77 Cal.Rptr.2d 107, 959 P.2d 265.) We further reasoned that a policy's "careful separation" of the obligations respecting "suits" from those concerning "claims" revealed the drafters' intention to ascribe differing meanings to the two obligations. (Ibid.) This reasoning applies with equal force to the CGL policy's careful separation of the obligations respecting defense from those concerning indemnification. One must assume that use of different language to describe the nature and scope of these distinct obligations was deliberate and intentional. In particular, the use of the term "suit" in defining the defense obligation, and its omission from the *696 definition of the indemnity obligation, reveals an intention that the indemnity obligation would be triggered not only by damages awarded in a civil action but also by the very same monetary obligation when imposed by a coercive administrative order. In other words, applying the Foster-Gardner rationale leads to a conclusion contrary to that reached by the majority here.
The majority's analysis is also inconsistent with this court's reasoning in Vandenberg v. Superior Court (1999) 21 Cal.4th 815, 88 Cal.Rptr.2d 366, 982 P.2d 229. At issue there was "whether a[CGL] policy that provides coverage for sums the insured is `legally obligated to pay as damages' may cover losses arising from a breach of contract." (Id. at p. 824, 88 Cal.Rptr.2d 366, 982 P.2d 229.) Construing this language according to "the meaning a layperson would ascribe to [it]," this court concluded that the policy provided indemnity coverage for the contract claim. (Id. at p. 840, 88 Cal.Rptr.2d 366, 982 P.2d 229.) This court explained that a contrary rule was unacceptable because it would "[p]redicat[e] coverage upon [the] injured party's choice of remedy or the form of action sought" and thereby "permit the injured ... party to determine insurance coverage." (Ibid.) Applying Vandenberg's logic to the issue here, I would conclude that a layperson would understand the term "damages" to include any sum the insured became legally obligated to pay to remedy harm, whether the legal obligation was established by court judgment or administrative order. The contrary rule, which the majority adopts here, is unacceptable because it permits an administrative agency to determine insurance coverage by its choice of remedy. If the agency proceeds to court to impose the cleanup costs, the indemnity obligation is triggered (AIU, supra, 51 Cal.3d at p. 841, 274 Cal. Rptr. 820, 799 P.2d 1253), but if the agency uses a coercive administrative order instead, the insured is left without coverage.
In support of its holding that an administrative cleanup order does not trigger a CGL carrier's duty to indemnify, the majority relies also on this syllogism: (1) A CGL carrier's duty to defend is broader than its duty to indemnify; (2) administrative agency proceedings do not trigger a CGL carrier's duty to defend; (3) therefore, an administrative order to pay remediation expenses does not trigger a CGL carrier's duty to indemnify. (Maj. opn., ante, 103 Cal.Rptr.2d at p. 682, 16 P.3d at p. 103-104.) The syllogism is logically unsound.
On several occasions, this court has remarked that an insurer's obligation to defend is broader than its obligation to indemnify, but we have explained that this means only that the insurer must defend a suit "if the complaint shows a potential liability within the policy coverage" (Gribaldo, Jacobs, Jones & Associates v. Agrippina Versicherunges A.G. (1970) 3 Cal.3d 434, 456, 91 Cal.Rptr. 6, 476 P.2d 406, italics in original), even though the insured ultimately prevails in the suit or the damages actually awarded are not within the policy coverage. (See Aerojet-General Corp. v. Transport Indemnity Co. (1997) 17 Cal.4th 38, 59, 70 Cal.Rptr.2d 118, 948 P.2d 909 [defense duty is broader because it "extends beyond claims that are actually covered to those that are merely potentially so"].) Thus this court has used the maxim that the defense obligation is broader than the indemnity obligation to explain why the defense obligation may exist even when the indemnity obligation does not. Before today, this court has never used the maxim to impose an artificial limit on the indemnity obligation.
In the landmark insurance case of Gray v. Zurich Insurance Co. (1966) 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168, this court held that an insurer could have a duty to defend even when there was no duty to indemnify and in the course of explaining this holding we said that the duty to defend "is independent of the indemnification coverage." (Id. at p. 274, 54 *697 Cal.Rptr. 104, 419 P.2d 168.) Because the insurer's two primary obligations are defined by separate policy provisions that use different language, the scope of each should be assessed separately, without the sort of artificial linkage that the majority imposes. (See Weyerhaeuser Co. v. Aetna (1994) 123 Wash.2d 891, 902, 874 P.2d 142 ["The two duties, to defend and to indemnify, should be examined independently"].) No general rule or maxim can take precedence over the basic principle that the mutual intention of the parties when they formed the insurance contract is controlling. (AIU, supra, 51 Cal.3d at pp. 821-822, 274 Cal.Rptr. 820, 799 P.2d 1253.) The proper measure of the duty to indemnify is the language of the indemnity provision, construed according to the accepted rules for insurance policies. I have explained why application of those rules leads to the conclusion that the CGL insurer must indemnify its policyholder for the costs of complying with the administrative cleanup order. I would so hold.
It remains to be seen exactly what impact today's decision will have on the practical operation of insurance coverage for environmental pollution cleanup costs. A CGL policyholder who receives from an administrative agency a demand to clean up pollution that has caused property damage may still look to the carrier for financial assistance, but the policyholder must be careful in phrasing its claim against the carrier. Because the majority here and in Foster-Gardner categorizes an environmental agency cleanup demand or order as a "claim," the policyholder must invoke the carrier's obligation to settle claims rather than its obligation to indemnify for damages that the policyholder is legally obligated to pay. If the carrier agrees to "settle" the "claim" by authorizing the policyholder to comply with the administrative order, then it appears that the carrier would be obligated to pay the cost of this "settlement," subject to policy provisions regarding deductible amounts, coverage limits, and so forth.
If the carrier declines to "settle" the "claim" by providing the policyholder with the funds needed to comply with agency demands, the policyholder has two options. The policyholder may comply with the agency directive by using its own funds and then seek to recover these costs by bringing suit against the insurer, not for breach of the duty to indemnify, but for breach of the duty to accept a reasonable settlement. Although this option achieves a prompt cleanup of the environment, consistent with the goals of environmental protection legislation, it may not be financially or legally attractive to the policyholder. Not only would the policyholder have to fund the cleanup on its own, a task that may be beyond its financial resources, it would also have to assume a difficult burden of proof in litigation against the carrier for breach of the duty to accept a reasonable settlement. The policyholder normally would have to prove, among other things, that failure to accept the "settlement" by compliance with the cleanup demand exposed the policyholder to liability in excess of the policy limits (see Murphy v. Allstate his. Co. (1976) 17 Cal.3d 937, 940-941, 132 Cal.Rptr. 424, 553 P.2d 584) or some other risk of particular harm (see Bodenhamer v. Superior Court (1987) 192 Cal.App.3d 1472, 1478-1479, 238 Cal.Rptr. 177 [even absent risk of an excess judgment, failure to settle may constitute bad faith if it exposes policyholder to adverse consequences, such as loss of business goodwill]).
If the carrier will not fund the policy-holder's costs of compliance with the cleanup order, the policyholder's other option is to decline to comply with the order, thereby forcing the agency to resort to judicial proceedings that will trigger the carrier's duty to defend and, should the agency prevail, as it almost invariably does, the carrier's duty to indemnify. If the cost of complying with the agency's judgment against the policyholder exceeds the policy limits, the policyholder may sue the carrier for the excess on a theory that the carrier, *698 by declining to accept a reasonable settlement, breached the implied covenant of good faith and fair dealing.
Thus, the majority's decision does not leave the policyholder faced with an agency cleanup order entirely without remedies against the CGL liability carrier, but because those remedies are not obvious to an unsophisticated policyholder, there is a risk that policyholders will forfeit valuable insurance coverage by failing to promptly invoke the carrier's settlement obligation. A policyholder astute enough to invoke the settlement obligation may still find itself enmeshed in a complex and tortuous series of legal proceedings before it obtains from the carrier the liability coverage for which it bargained. But the big losers in today's decision are public health and the environment, because a policyholder's only financially viable option, should the carrier decline to fund compliance with agency directives, may often be to ignore agency cleanup orders, thereby forcing the government to resort to litigation and delaying effective remediation of environmental pollution.
WERDEGAR, J., concurs.
NOTES
[*] Kennard, J., and Werdegar, J., dissented.
[1] Apparently, in the original or first amended cross-complaint, or both, Powerine had alleged that the London Insurers owed it, but denied, a duty to defend in the pending EPA/CERCLA and Regional Water Boards/Porter-Cologne Act proceedings, and had prayed for a declaration accordingly, but had removed such allegation and prayer from the second amended complaint in the face of Foster-Gardner.
[2] Powerine requests us to take judicial notice of our own records as to the following documents: (1) a letter by the Attorney General of the State of California filed in this cause in support of Powerine's petition for review; and (2) a letter by the Director of the Department of Toxic Substances Control of the California Environmental Protection Agency received in the Foster-Gardner cause in support of a petition by Foster-Gardner for rehearing or, in the alternative, for modification of our opinion therein. We grant the request. As a reviewing court (Evid.Code, § 459, subd. (a)), we may, of course, take judicial notice of our own records (id., § 452, subd. (d)). We hereby do so.
[3] Until 1986, the standard comprehensive general liability insurance policy (American Star Ins. Co. v. Insurance Co. of the West, supra, 232 Cal.App.3d at p. 1323, fn. 1, 284 Cal.Rptr. 45) did not define "suit." (Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra, 18 Cal.4th at p. 864, fn. 3, 77 Cal. Rptr.2d 107, 959 P.2d 265.) Since 1986, what is now named the standard commercial general liability insurance policy (American Star Ins. Co. v. Insurance Co. of the West, supra, 232 Cal.App.3d at p. 1323, fn. 1, 284 Cal.Rptr. 45) has done so, generally stating that a "suit" is a "civil proceeding." (Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra, 18 Cal.4th at p. 864, fn. 3, 77 Cal.Rptr.2d 107, 959 P.2d 265.) In Foster-Gardner, we had before us the pre-1986 standard comprehensive general liability insurance policy without such a definition. (Id. at p. 864, 77 Cal.Rptr.2d 107, 959 P.2d 265.) So too here.
[4] Other provisions of the standard policy support, or at least do not contradict, our conclusion that the narrower focus on the standard policy itself reveals that the duty to indemnify is limited to money ordered by a court.

In support is the so-called no-action provision, which, in typical language, generally states that "no action" by a third party "shall lie" against the insurer unless the insured's "obligation to pay shall have finally been determined" either by a "judgment" against the insured "obtained after an actual trial" or by a "settlement" reduced to contract to which the insurer "agrees." This provision implies that the insurer may owe a duty to fund such a settlement. It also implies that the insurer may owe a duty to indemnify. In so doing, referring as it does to a "judgment," it implies as well that that duty is limited to money ordered by a court.
Not in contradiction is the so-called other insurance/excess insurance provision, which, in typical language, generally states that, if there is "any other good, valid and collectible insurance" for the insured with respect to a "covered" "loss or claim," "this insurance shall be excess insurance only." This provision implies that, as to such a loss or claim, the insurer may owe a duty to indemnify or a duty to fund a settlement. But it does not state or imply that the insurer owes a duty to fund a settlement that is not reduced to contract to which it agrees. Or that the insurer owes a duty to indemnify that is not limited to money ordered by a court.
[5] See San Diego Housing Com. v. Industrial Indemnity Co. (1998) 68 Cal.App.4th 526, 543, 80 Cal.Rptr.2d 393.
[6] Accord, 1 Appleman on Insurance 2d (Holmes ed.1996) section 1.15, page 66 ("In the standard liability insurance policy, the insurer makes two promises in exchange for receiving a premium: (1) the insurer's promise to defend lawsuits against the, insured, and (2) the insurer's promise to pay (indemnify) the insured for any damages legally imposed against the insured in that lawsuit." (Italics added.)).

We acknowledge the expression of contrary views in Stanzler and Yuen, Coverage for Environmental Cleanup Costs: History of the Word "Damages" in the Standard Form Comprehensive General Liability Policy, 1990 Colum.Bus.L.Rev. 449. To be specific, the authors assert that, through the mid-1950's, "[n]umerous representatives of the insurance industry never claimed that the undefined word `damages'" in the provision imposing the duty to indemnify in the standard policy, limited the duty to money ordered by a court, as in "sums awarded by a jury." (Id. at p. 470.) We shall disregard the affiliation of the article's authors, who were then a member and an associate, respectively, of a law firm that served as counsel on behalf of insureds against insurers. But we cannot draw the inference that they evidently desire us to: Contrary to their suggestion, the asserted absence of a claim of limitation does not amount to the presence of an admission of its opposite.
[7] See, e.g., Zurich Insurance Co. v. Cams Corp. (1997) 293 Ill.App.3d 906, 908-910, 228 111.Dec. 258, 689 N.E.2d 130; compare Patrons Oxford Mut. Ins. Co. v. Marois (Me. 1990) 573 A.2d 16, 18-20 (dealing with a "special multi-peril policy" of liability insurance that is similar to the standard policy of comprehensive general liability insurance).
[8] See, e.g., Ala. Plating v. U.S. Fidelity and Guar. (Ala. 1996) 690 So.2d 331, 336-337 (by the court) (semble ); Public Service Co. of Colorado v. Wallis (Colo.Ct.App.1997) 955 P.2d 564, 567-568, reversed on other grounds sub nomine Public Service Co. v. Wallis and Companies (Colo. 1999) 986 P.2d 924; Bausch & Lomb v. Utica Mutual (1993) 330 Md. 758, 780-783, 625 A.2d 1021 (dictum); SCSC Corp. v. Allied Mut. Ins. Co. (Minn. 1995) 536 N.W.2d 305, 313; Minnesota Min. & Mfg. v. Travelers Indem. (Minn. 1990) 457 N.W.2d 175, 182-183; Brown Group, Inc. v. George F. Brown & Sons (Mo.Ct.App.1997) 963 S.W.2d 285, 287-288; Ryan v. Royal Ins. Co. of America, supra, 916 F.2d at pages 735-743 (applying New York law) (dictum); Weyerhaeuser Co. v. Aetna (1994) 123 Wash.2d 891, 896-913, 874 P.2d 142; Compass Ins. Co. v. Cravens, Dargan & Co. (Wyo.1988) 748 P.2d 724, 728; Morrisville Water & Light Dept. v. USF & G (D.Vt.1991) 775 F.Supp. 718, 726-727 (applying Vermont law).
[9] In support is the standard policy's no-action provision, which implies that the insurer may owe a duty to indemnify, and also implies, through its reference to a "judgment," that the duty is limited to money ordered by a court. Not in contradiction is the standard policy's other insurance/excess insurance provision, which itself implies that the insurer may owe a duty to indemnify, but does not imply that the duty is not limited to money ordered by a court. (See fn. 4 of 103 Cal. Rptr.2d at p. 683, 16 P.3d at p. 104, ante.)
[10] Neither is necessary any reference to a "judgment" or "final judgment," as appears in the provision of the standard policy of excess liability insurance imposing on the insurer a duty to indemnify the insured after exhaustion of other insurance.
[11] See the decisions cited in footnote 8 of 103 Cal.Rptr.2d at page 685, 16 P.3d at page 106, ante.
[12] In her dissenting opinion, Justice Kennard proceeds as though the duty to indemnify were not correlative to the duty to defend. It is far too late in the day to attempt to deny that this is so. Hence, we cannot agree that the correlation in question is a "legal fiction that [we] conjure[ ] from the void to fill [a] yawning gap in [our] analysis." (Dis. opn. of Kennard, J., post, 103 Cal.Rptr.2d at p. 694, 16 P.3d at p. 114.) It is, rather, a factual reality that we must all confront. Hence, if there is indeed a "yawning gap," it is not in our analysis. Recall that the insurer's duty to indemnify the insured is to "pay all sums that the insured becomes legally obligated to pay as damages" for harm proved within coverage. If, in fact, "`damages'" were "to include any sum the insured [becomes] legally obligated to pay to remedy [such] harm" (id. at p. 696, 16 P.3d at p. 116), then the duty to indemnify would reduce itself to a duty to "pay all sums that the insured becomes legally obligated to pay as any sum that the insured becomes legally obligated to pay"in order words, a duty to "pay all sums that the insured becomes legally obligated to pay" simpliciter, omitting "as damages." Not even when "public health and the environment" are invoked (id. at p. 698, 16 P.3d at p. 118) will we rewrite the provision imposing the duty to indemnify into what would amount to a broad financial-subsidy arrangement under which the insurer would "pay any sum that the insured becomes legally obligated to pay."
[13] In support of our conclusion that the narrower focus on policy No. LAB 2579 itself reveals that the duty to indemnify is limited to money ordered by a court is its no-action provision, which states that "[n]o action" by a third party "shall lie against [the] Underwriters until the Assured's obligation to pay shall have finally been determined either by judgment against the Assured after actual trial or by" contract in settlement in specified form to which the "Underwriters" "agree[]." (See fn. 4 of 103 Cal.Rptr.2d at p. 683, 16 P.3d at p. 104, ante.) Not in contradiction is its other insurance/excess insurance provision, which states that, "[i]n the event that there shall be in effect any other good, valid and collectible insurance inuring to the benefit of the Assured ... with respect to loss or claim covered hereby, then this insurance shall be excess insurance only...." (See ibid.)
[14] Not at all needing, for example, any reference to "judgment" or "final judgment," as appears in the provision of an excess liability insurance policy for bodily injury and property damage of the same term, imposing on the London Insurers a duty to indemnify Powerine after exhaustion of insurance under policy No. LAB 2579 itself. (See fn. 10 of 103 Cal.Rptr.2d at p. 689, 16 P.3d at p. 109, ante.)
[15] The Court of Appeal also concluded that each of the insurance policies other than policy No. LAB 2579 imposes on the London Insurers a duty to indemnify Powerine that is limited to money ordered by a court, and does not extend to any expenses required by an administrative agency, like the Regional Water Boards, pursuant to an environmental statute, like, the Porter-Cologne Act. Powerine does not challenge this conclusion. Hence, we need not, and do not, consider it further.