COMMUNITIES FOR A BETTER
ENVIRONMENT, Plaintiff,

v.

CENCO REFINING COMPANY,
et al., Defendants.

No. CV00–5665(AHM)(AIJX).

United States District Court,
C.D. California.

Sept. 26, 2001.

David A. Rosen, Gideon Kracov, Rose Klein & Marias, Los Angeles, CA, Richard T. Drury, Anne E. Simon, William B. Rostov, Oakland, CA, Everett L. DeLano, III, Everett L. DeLano III Law Offices, Escondido, CA, J. Scott Kuhn, Huntington Park, CA, for Communities for a Better Environment.

Kurt Weissmuller, Deanne L. Miller, Jocelyn D.N. Thompson, Weston Benshoof Rochefort Rubalcava & MacCuish, Los An-

geles, CA, Evelyn F. Heidelberg, Robert H. Conrad, Jr., Latham & Watkins, Los Angeles, CA, Dean G. Dunlavey, Michael James Carroll, Latham & Watkins, Costa Mesa, CA, James E. Curry, George Gallegos, White O'Connor Curry Gatti & Avanzado, Los Angeles, CA, for Cenco Refining Co., Cenco.

Piero C. Dallarda, Jennifer T. Buckman, Best Best & Krieger, Riverside, CA, Barbara B. Baird, Gloria L. White–Brown, Kurt R. Wiese, Diamond Bar, CA, Gene Tanaka, Best Best & Krieger, Sacramento, CA, for South Coast Air Quality Management District (SCAQMD), Barry R. Wallerstein, William A. Burke, Norma J. Glover, Michael D. Antonovich, Hal Bernson, Cynthia P. Coad, Beatrice JS Lapisto–Kirtley, Ronald O. Loveridge, Jon D. Mikels, Leonard Paulitz, S. Roy Wilson.

Evelyn F. Heidelberg, Robert H. Conrad, Jr., Latham & Watkins, Los Angeles, CA, Dean G. Dunlavey, Michael James Carroll, Latham & Watkins, Costa Mesa, CA, James E. Curry, George Gallegos, White O'Connor Curry Gatti & Avanzado, Los Angeles, CA, for Robertson Charitable Remainder Unitrust.

Colin Lennard, Patricia Jean Chen, Fulbright & Jaworski, Los Angeles, CA, Steven Neil Skolnik, Steven N. Skolnik Law Offices, Santa Monica, CA, for City of Sante Fe Springs.

James E. Curry, George Gallegos, White O'Connor Curry Gatti & Avanzado, Los Angeles, CA, for Pat Robertson.

ORDER DENYING CBE'S MOTION FOR SUMMARY ADJUDICATION AND PERMANENT INJUNCTION AND GRANTING CBE'S MOTION FOR PRELIMINARY INJUNCTION

MATZ, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ............................................... 1132

II. FACTS ....................................................... 1133

III. DISCUSSION ................................................. 1137
 A. Alleged Violations of the Clean Air Act ..................... 1137
 1. The Mere Change of Ownership Did Not Void The Refinery's Permit.... 1137
 2. Alterations Made To Some Refinery Equipment, Standing Alone, Did Not Void The Refinery's Permit ................................. 1139
 a. Types of Alteration ........................................ 1139
 b. Increase in Emissions: The Proper Baseline ..................... 1140
 c. Summary: Alterations ...................................... 1141
 3. The Six–Year Shutdown of the Facility, in Conjunction with Refinery Modifications, Triggers New Source Review Under the Clean Air Act ....................................................... 1142
 a. CBE Has Made a Strong Showing That Rule 209 Voids Permits for Equipment That Has Been Permanently Shutdown ........... 1142
 b. CBE Has Made a Strong Showing That the Factors in EPA's Reactivation Policy (Concerning the Application of NSR to Permanently Shutdown Facilities) May Be Taken into Account In Interpreting the Clean Air Act ............................. 1143
 c. CBE Has Made a Strong Showing That the Refinery Was Permanently Shutdown Under Rule 209 ....................... 1144
 i. Two Years or More of Non-operation ...................... 1144
 ii. Reason for Shutdown ..................................... 1145
 iii. Intent and Plans to Restart ............................... 1145
 iv. Cost and Time Required to Reactivate ..................... 1146

 v. Status of Permits ........................................1146
 vi. Ongoing Maintenance and Inspections ......................1147
 vii. Summary ...........................................1147
 4. Miscellaneous SIP Provisions ...................................1147
 B. Relief ..................................................1148

IV. CONCLUSION ................................................1148

## I. INTRODUCTION

This action is before the Court on the motion of Plaintiff Communities for a Better Environment ("CBE") for partial summary adjudication and a permanent injunction, or in the alternative, a preliminary injunction. As described in this Court's June 2001 Order denying defendants' motions to dismiss, CBE alleges that Cenco Refining Company ("Cenco") and the South Coast Air Quality Management District ("SCAQMD") have failed to comply with the Clean Air Act by neglecting to apply New Source Review ("NSR") to Cenco's Santa Fe Springs crude oil refinery.

CBE asserts the following grounds for its motion.[1] First, CBE asserts that Defendants violated the California State Implementation Plan ("SIP") by failing to void the Refinery's Facility Permit when it was transferred to Cenco and when Refinery equipment was altered. CBE argues that if the Permit were properly voided, NSR would apply to the Refinery. Second, CBE asserts that Defendants should have applied NSR to the Refinery under the SIP and the EPA's Reactivation Policy because the prior Refinery owner permanently shutdown the facility and it has been non-operational for six years. Final-

ly, CBE asserts that Defendants violated several other miscellaneous SIP provisions: Rule 2005(c)(2) requiring that a facility hold sufficient RECLAIM trading credits to offset facility emissions for the first year of operation (FAC Fifth Cause of Action); Rule 201 prohibiting construction without first complying with NSR (FAC Seventh Cause of Action); Rule 210 prohibiting submission of incomplete or inaccurate information—here, failure to submit materials required by NSR—to SCAQMD (FAC Seventh Cause of Action); and Rule 212 requiring a 30 day Public Comment period for grants of permits (FAC Second Cause of Action).

In its motion, CBE seeks summary adjudication of its First, Second, Fourth, Fifth and Seventh Causes of Action (*see* Proposed Judgment) and

> a permanent injunction requiring Cenco and SCAQMD to conduct a public NSR process, including an alternatives analysis, to install BACT prior to commencing operations, to offset its emissions, and ordering SCAQMD to rescind Cenco's facility permit until such time as it completes the NSR process. Alternatively, if the Court finds there are any material facts genuinely at issue, CBE requests a

---

1. In its opening motion, CBE asserts first that it has organizational standing to bring this action. Defendant's opposition brief does not challenge CBE's showing. In its prior Order denying Defendants' Motions to Dismiss, this Court stated that "[f]or the guidance of the parties, the Court notes that even if the motions to dismiss were converted to motions for summary judgment, plaintiffs' standing showing would still likely be sufficient." The

Court's inclination was based on declarations from CBE members and citizens of the City of Santa Fe Springs stating that they had apprehended chemical odors emanating from the facility. The Court finds that CBE has standing to sue on this basis. Plaintiff's Statement of Uncontroverted Facts 36 (describing declarations of CBE members who have apprehended odors).

preliminary injunction prohibiting Defendants from taking actions in furtherance of construction or operation of the facility and requiring SCAQMD to rescind Cenco's permits pending trial. Motion, pp. 2–3.

For the reasons set forth below, the Court DENIES CBE's Motion for summary adjudication and a permanent injunction. Defendants have raised triable issues as to all of CBE's claims. Moreover, the Court DENIES CBE's motion for a preliminary injunction based on CBE's claims that either the transfer of the facility permit, standing alone, or the specific alterations to the facility, standing alone, violated the SIP and triggered NSR. However, the Court finds that CBE has made a showing sufficient to warrant a preliminary injunction on its claim that the Refinery's six year long shutdown, in conjunction with its physical modifications, required NSR for the entire facility; the motion is GRANTED on this ground.

## II. FACTS

This case involves a crude oil refinery located at 12345 Lakeland Road, Santa Fe Springs, in southeastern Los Angeles County. Plaintiff's Statement of Uncontroverted Facts ("PSUF") 1. Immediately prior to August 1998, the refinery was owned by Powerine Oil Company. Id. at 2. In June 1995, Powerine wrote SCAQMD that it would be shutting down its refinery beginning the first week in July, 1995. Id. at 8. Powerine suspended all refining operations on July 3, 1995 and has not refined crude oil since that date. Id. at 9.

In September 1995, Powerine's parent company, Castle Energy, entered into a contract for the sale of the refinery equipment to Kenyen Projects Ltd. Id. at 10; Defendants' Additional Material Facts ("DAMF") 56–57. Under the contract, the refinery equipment would be dismantled and shipped to India. DSUF 11; DAMF 56. Powerine informed certain regulatory authorities that it had sold its refinery equipment and that the equipment would be dismantled and shipped to India. PSUF 11. In October 1995, Powerine informed SCAQMD that it was "in the process of shutting down the refinery for its ultimate dismantling" and that Powerine's new parent company planned to dismantle the refinery. Id. at 12–13. Also in October 1995, Powerine applied to SCAQMD to obtain Emission Reduction Credits. Id. at 14. Finally, Powerine repeatedly requested suspension of regulatory reporting requirements on the basis that the refinery had suspended operations. Id. at 41.

Powerine's then-Chief Financial Officer declares that although Powerine accepted Kenyen's proposal, Powerine's management disagreed with the Kenyen deal, expressed concerns to Castle that the Kenyen deal was unlikely to be successfully implemented and requested that a deal be reached with another company, Energy Merchant Corporation, so that refining operations could be resumed. Egner Decl. 4–5.

In December 1995, Powerine informed various state entities, including the Los Angeles Regional Water Quality Control Board, that the refinery might be resuming crude oil processing. DAMF 60. It informed the Regional Water Quality Control Board that Powerine was negotiating with a prospective buyer who "plan[ned] to bring the refinery back in operation, and rehire the majority of 350 laid off employees" and "desire[d] to purchase the refinery equipment back from Kenyen Projects Ltd, the firm which purchased the refinery equipment and had been making plans to dismantle the refinery equipment and transport it to India." Christman Decl., Exh. 16.

■ In January 1996, Energy Merchant Corporation purchased Powerine's stock, thus divesting Castle Energy of ownership. DAMF 63. Michael Egner and June Christman, the then-Environmental Engineering Manager for Powerine, declare that Powerine "acquired Kenyen's rights to the refinery equipment" in February 1996. Egner Decl. 7; Christman Decl. 8.[2] In February 1996, Powerine submitted a letter to SCAQMD requesting cancellation of its application for Emission Reduction Credits, and stated that Energy Merchant Corporation had "the ultimate goal of operating the refinery again." Christman Decl., Exh.20.

Throughout the period of time crude oil refining was suspended, Powerine kept in force the permits it had secured from other agencies, including the Los Angeles Regional Water Quality Control Board and the Los Angeles County Sanitation District. DAMF 67.

Powerine demolished a 28,000 square foot main office building, a warehouse, truck fuel loading racks, tanks and associated equipment, and sold the property on which the equipment was located. PSUF 17. It is not clear when this occurred or who owned the facility at the time. In 1997, Powerine informed SCAQMD that it had disconnected all fuel feed lines and disconnected and flanged a process feed line or removed a major component of the process for all RECLAIM sources. Id. at 60.

June Christman declares that from 1995 to 1998, Powerine employed two dozen employees at the facility and did use some equipment at the facility, such as utility, storage, wastewater treatment, stormwater management and emergency equipment. DAMF 68. She also declares that the refinery processed remaining sour water through November 1995; processed butane into isobutane at the refinery from May to August 1996; and resumed refining activity with the reformate splitter to produce diesel fuel during September 1996. However, in an unrelated lawsuit, the California Supreme Court stated that since 1995, the facility "has not been operated at all, and only a skeleton crew of employees has remained, primarily for environmental compliance and equipment maintenance purposes." *Certain Underwriters at Lloyd's of London v. Superior Court*, 24 Cal.4th 945, 951, 103 Cal.Rptr.2d 672, 16 P.3d 94 (2001). Moreover, Cenco informed the Securities and Exchange Commission ("SEC") in 1998 that "[t]he refinery has had no operations since July 1995" and that "[c]urrently, the refinery has a skeleton staff that oversees the maintenance of its assets, which consist of an oil refinery and related assets." Reply Request for Judicial Notice, Exh.4. Defendants do not dispute that the facility has not refined crude oil since 1995. PSUF 9.

Several times between 1995 and 1998, the SCAQMD Fee Review Committee addressed whether the annual and emission permit fees paid by Powerine regarding its refinery in Santa Fe Springs were current. Each time the Fee Review Committee addressed this question during this period, it concluded that Powerine's permits were either active or, when they expired, were timely reinstated. DAMF 12. Powerine repeatedly expressed its intent to resume crude oil refining to the District's Fee Review Committee. For example, in a series of letters to the District during the 1996 through 1998 time period, Powerine

---

**2.** CBE objects to the declarations on the ground that no contractual agreement has been provided to the Court. The objection is overruled. The "Best Evidence Rule" does not preclude the admission of this evidence, at least not in the absence of a concrete challenge to the factual accuracy of these statements.

repeatedly explained that it was committed to resuming refining activities. Id. at 13. Due to cash flow constraints, Powerine asked for several extensions of time for pending financing arrangements to be completed. The District granted these requested extensions. Powerine paid its fees as it obtained revenues to do so. On July 31, 1996, Powerine sent a letter to the District's Fee Review Committee, forwarding checks totaling $91,235.67, which, when added to Powerine's credit with the District for $33,764.33, totaled $125,000, the amount of Powerine's second payment for past due fees. Id. at 14. From July 1995 through July 30, 1998, Powerine paid SCAQMD $207,396.08 for its annual permit fees and $58,126.75 for emission fees necessary to keep the permits active. Id. at 16. SCAQMD, in a December 17, 1997 letter, informed Powerine that Powerine could allow the permits to expire. The permits would not be permanently revoked if Powerine paid a 15% penalty within one year. Id. at 16. In a letter to the District dated January 28, 1998, Powerine accepted the District's proposal and allowed its permits to expire subject to the understanding that they could be reinstated upon payment of a 15% penalty within one year. Id. at 17.

In July 1998, Powerine applied to SCAQMD to reactivate its expired permits. Mueller Decl. 3. In August 1998, Cenco formally purchased the refinery from Powerine, PSUF 21. In October 1998, Cenco applied for a change of ownership for Powerine's equipment. On December 29, 1998, SCAQMD reactivated Powerine's expired permit to operate, PSUF 26. Although the timing is disputed, at some point between October 1998 and January 1999, SCAQMD made Cenco the holder of the refinery facility permit, DAMF 46.

SCAQMD reactivated the facility permit based on its investigation of the facility's operations from 1995–1998, Powerine's efforts to keep its permits alive during that period, and SCAQMD's inspections of refinery equipment in 1998. DAMF 18–25. Regarding the condition of refinery equipment in 1998, CBE proffers a 1998 letter from SCAQMD to Powerine indicating that its inspection "found that several pieces of refinery equipment were altered, dismantled or removed" and a December 1998 stipulation between Cenco and SCAQMD reciting that inspections "indicated a general state of disrepair of the refinery equipment." PSUF 60–61. CBE also introduces a letter from Cenco to the SEC in 1998 stating that "[t]he Refinery's assets are not in working condition 'as is.' Significant capital improvements and other turnaround costs will be incurred before refining can commence." Reply RJN, Exh.4.

■ Defendants counter with the declaration of Roger Christopher, the SCAQMD Supervising Air Quality Inspector in the Petroleum and Refinery Unit, who inspected the Powerine refinery on August 7, 1998. He found that the "refinery's equipment was in substantially the same condition as it had been in 1989" and that it was not "so dilapidated that it could not be operated." Christopher Decl. 5; DAMF 23–24. He declares that "the refinery was fully capable of being operated by reconnecting fuel supply lines that provided fuel gas to power refinery equipment and by draining off nitrogen that had been injected into most of the equipment to prevent rust." Christopher Decl., 5, 6.[3] Moreover, none of the equipment at the

---

**3.** CBE objects to Christopher's declaration as improper opinion testimony. This objection is overruled.

Powerine refinery had been flanged-off, other than blind flanges on the fuel gas lines, which could be easily removed. Powerine had flanged off the fuel gas lines by removing a piece of piping or a valve and bolting a flange over the open end of the pipe. Blind flanges are often put in place on fuel gas lines for equipment that has been temporarily removed from operation so that the equipment may qualify for less stringent emissions reporting requirements under SCAQMD's RECLAIM program. Christopher Decl., 7.

Since purchasing the refinery in August 1998, Cenco has operated a flare, fuel gas system, fire water system, effluent water treatment system, cooling water system, and plant air system. DAMF 70.

Since its purchase, Cenco has applied to SCAQMD, the City of Santa Fe Springs, and the State Water Board for the permits necessary to operate the refinery. PSUF 22. In September 1998, the City issued a conditional use permit to Cenco that required the refinery to make health and safety modifications to the refinery. Id. at 64; See Exh. J to Mueller Decl. One condition is that Cenco convert the refinery's existing alkylation unit (this unit is "critical to the production of clean, reformulated fuels which meet the requirements of the Clean Air Act," DAMF 66) to an entirely new process called "modified HF." PSUF 66–67. Moreover, the City required Cenco to use a new Rapid Acid Transfer System in conjunction with the modified HF process. Id at 71. Because the Refinery cannot currently manufacture gasoline in compliance with state regulations, Cenco must make modifications to enable the refinery to manufacture reformulated fuels

in compliance with State regulations. Id. at 78.

Cenco has never submitted an alternatives analysis[4] to SCAQMD as described in Rules 2005 and 1303 to SCAQMD. PSUF 111. Cenco has not installed BACT nor has it proposed to install BACT on every emission source at the refinery. Id. at 112.

Based on its inspectors' audits of the equipment and analysis of other facts it gathered, as well as an analysis of whether the above-discussed facts fall within EPA's Reactivation Policy (see below), the District concluded that some of Powerine's permits could be reactivated consistent with SCAQMD rules and EPA policy. DAMF 30; Mueller Decl., 10, 13 and Exh. E thereto. As to equipment that SCAQMD found to be modified or altered, SCAQMD refused to reactivate permits and required Powerine to undergo NSR before a permit could be issued for such equipment. DAMF 28; Mueller Decl., 10 and Exh. C (August 26, 1998 Letter from SCAQMD to Powerine) and Attachment A thereto (specifying altered, dismantled or removed equipment for which permits could not be reactivated); Christopher Decl., 8, 9 and Exh. 1 and Attachment A thereto.

Based on its inspectors' audit of the equipment at the Powerine refinery, SCAQMD refused to reinstate permits to construct for which Powerine had not initiated construction. CENCO filed permit applications for this equipment as part of the 47 applications it later filed, and the SCAQMD further evaluated them through NSR. DAMF 29; Mueller Decl., 10 and Exh. C thereto.

---

4. Rule 1303(b)(5)(A) defines "alternative analysis" as "an analysis of sites, sizes, production processes, and environmental control techniques for such proposed source and demonstrate that the benefits of the proposed project outweigh the environmental and social costs associated with that project."

Of the 47 CENCO Refinery Upgrade Project permit applications, SCAQMD applied NSR only to modifications that were found to increase emissions. Vo Decl., 5–7 and Exh. 11. Apparently, in determining whether equipment increased emissions, SCAQMD looked to a baseline consistent with the facility's emissions before the suspension of operations in 1995. Vo. Decl. Exh. 11.

## III. DISCUSSION

### A. Alleged Violations of the Clean Air Act

#### 1. The Mere Change of Ownership Did Not Void The Refinery's Permit

■ SCAQMD Rule 209 provides that: [a] permit shall not be transferable, whether by operation of law or otherwise, from one location to another, from one piece of equipment to another, or from one person to another. When equipment which has been granted a permit is altered, changes location, or no longer will be operated by the permittee, the permit shall become void.

In its opening motion, CBE asserts that "[o]n January 15, 1999 SCAQMD transferred Powerine's facility permit to Cenco" and that this transfer of ownership "voids"

**5.** At the hearing, CBE argued that Rule 209 "trumps" Rule 301 such that the meaning of Rule 209 should not be limited by any language in Rule 301. CBE relies on subsection 301(d)(1) which provides that

the Executive Officer shall establish an annual operating fee due date for each permittee for all permits associated with the same premises. Thereafter, All Permits to Operate … shall be renewable as set forth below, on the annual operating fee due date set by the Executive Officer for all permits associated with the same premises *subject to any other requirements of these rules and regulations or state law, regarding validity, voiding or revocation of permits.*

the permit under Rule 209. Motion, p. 9. However, in its Reply, CBE states that "it was *not* the mere change in ownership" that violated the Clean Air Act, "but rather the refinery's shutdown, alteration, deterioration, and Cenco's plans to start operations and construction of a modified refinery." Reply, p.6 (emphasis added).

The Court finds that a mere change in ownership of equipment does not void that equipment's permit under Rule 209. The Court instead adopts Defendants' interpretation of the SIP provision: "Rule 209 prevents a permit transfer from one person to another *without applying to the District.*" Opposition, p.8.

First, this reading of Rule 209 harmonizes the Rule with other SIP provisions and California statutory law. District Rule 301.1 expressly contemplates revision of permits to reflect changes in ownership:

When an application for change of ownership of a permit to operate or an emission reduction credit certificate is filed within 24 months of the date of transfer, and there has been no change of operation and a permit to operate or an emission reduction credit certificate had previously been granted and has not otherwise expired,[5] the applicant shall pay a filing fee of $110 for each permit.

Although Rule 209 does provide for "voiding" of permits, subsection 301(d)(1) does not mean that Rule 209 *cannot* be read in light of Rule 301. Instead, subsection 301(d)(1) appears to mean simply that annual permit renewal is not automatic if a permit was invalidated under another rule. The provision by no means precludes the Court from favoring a construction of Rule 209 that is consistent with Rule 301.1's clear endorsement of changes of ownership. Moreover, CBE's understanding of the relationship between Rule 209 and Rule 301 compels an interpretation of Rule 209 (that it altogether bars changes of ownership) that not even CBE adopts.

CBE asserts that the Refinery's facility permit had previously expired and that there will

Moreover, while District Rule 1303(b) subjects changes in the "method of operation" of equipment to NSR, Rule 1302 specifically excludes changes in operators from the definition of "changes in the method of operation": "[a] change in the method of operation of equipment, unless previously limited by an enforceable permit condition,[6] shall not include ... a change in the operator of the facility."

Finally, California Health & Safety Code § 42301(f) provides that an air district's permitting system shall:

> [p]rovide for the reissuance or transfer of a permit to a new owner or operator of an article, machine, equipment, or contrivance ... However, under no circumstances shall the criteria [for issuing the permits] specify that a change in ownership or operator alone is a basis for requiring more stringent emission controls or operating conditions than would otherwise apply to the article, machine, equipment or contrivance.

These provisions of the SIP, which includes Rule 209, and state law provisions are consistent with Defendants' interpretation of Rule 209 and appear to conflict with a bar to changes in ownership.

Moreover, Defendants' plain language reading of Rule 209 makes sense. They contend that Rule 209's prohibition against permit transfers without applying to the District serves to "ensure that the District has, at all times, a record of the current owner for notice and citation purposes." Opposition, p.8; Thompson Decl. 4, 8–9; Muller Decl. 4. CBE neither disputes that this represents a sensible explanation of Rule 209's purpose nor proffers any practical justification for interpreting that Rule as a *per se* bar to changes in operators.

Defendants add that CBE's interpretation of Rule 209 would be "unworkable as a practical matter" because "[e]ach month, the District processes approximately 150 applications for change of ownership/operator" and the application process is "ministerial"; "[i]f these applications were all subject to NSR, the District's permitting operations would be thrown into chaos." Thompson Decl. 4, 6–7; Mueller Decl. 11. Defendants also assert that "CBE's interpretation would render much equipment throughout the South Coast District valueless"; "[t]he cost of conducting NSR and upgrading the equipment with BACT would in many cases be prohibitive and require scrapping the equipment instead of selling it." Opposition, p.11; Mueller Decl. 11; Coy Decl. 8.

In light of Rule 209's language, the governing statutory scheme, practical considerations, and CBE's express acknowledgment that "it was not a mere change in ownership" that required new source review under the Clean Air Act, the Court declines to find that the mere change in owner of the Powerine refinery voided the refinery's permit.[7]

---

be a change in operation, making Rule 301.1 inapplicable. However, SCAQMD apparently reactivated the permit before it approved the change in operator. The Court addresses CBE's challenge to the validity of the reactivation elsewhere in this order. The Court also deals with CBE's allegation of a change in operation elsewhere.

6. CBE asserts that Rule 209 represents an enforceable permit condition and suggests that Rule 209 does make a mere change in ownership a "change in method of operation." However, Rule 209 provides no such equivalence. Moreover, if Rule 209 did so provide it would nullify the quoted clause from Rule 1302 because a change in ownership would always be a change in method of operation.

7. The Court rejects CBE's contention that the EPA's notice of violation to Cenco compels accepting CBE's interpretation of Rule 209. Although the notice of violation did state that "under District Rule 209, the permits became void when Powerine attempted to transfer its

### 2. Alterations Made To Some Refinery Equipment, Standing Alone, Did Not Void The Refinery's Permit

#### a. Types of Alteration

 CBE contends that the facility permit became void because under Rule 209 facility equipment was "altered" in four ways. First, Powerine "disconnected all fuel feed lines and disconnected and flanged a process feed line or removed a major component of the process for all of its RECLAIM sources." PSUF 60. Second, Powerine demolished a 28,000 square foot main office building, a warehouse, truck fuel loading racks, tanks and associated equipment, and sold the property on which the equipment was located. Id. at 17. Third, "the refinery fell into a state of disrepair due to non-use." Motion, p.11; PSUF 61–62. Fourth, prior to SCAQMD's issuance of a facility permit to Cenco, the City issued a Conditional Use Permit ("CUP") to Cenco containing 57 separate conditions of approval which required Cenco to make numerous modifications to the refinery. PSUF 64–65, 71–72, 77–79.

Defendants respond that the specific asserted changes to facility equipment either did not increase emissions, in which event NSR was not required under the SIP, or were in fact subjected to NSR. They rely on Rule 1303(b), which provides that "[t]he Executive Officer shall, except as Rule 1304 applies, deny the Permit to Construct for any new or modified source which results in a net emission increase of any nonattainment air contaminant at a facility, unless each of the following requirements are met ..." and then proceeds to list NSR requirements. According to defendants, the disconnecting and flanging of fuel lines did not result in emissions increases, but instead were "temporary measures taken in recognition of the fact that the equipment was temporarily non-operational." Opposition, p.15. The demolition of the office building was not subject to NSR because "demolition of equipment is not subject to NSR and the demolished office building never required a permit in the first place." The new truck loading rack replacing the demolished rack *was* subjected to NSR. Opposition, p.15; Vo Decl. 3, Exh.11. Regarding the alleged equipment disrepair, Defendants submit evidence to show that the equipment for which permits were reinstated was "largely in working order." Christopher Decl. 3–4. Finally, Defendants assert that the modifications required by the City's CUP were all subjected to NSR if they increased emissions. Vo Decl. 4, Exh.12.

permits to Cenco in August 1998," notices of violation are not proof of anything. *See Air California v. United States Dept. of Transportation*, 654 F.2d 616, 620 (9th Cir.1981) (the only effect of a notice of violation by EPA is to "trigger the statutory mechanism for informal accommodation which precedes any formal enforcement measures"). Moreover, the NOV appears to rely on either a mistaken or different version of Rule 209 than the one enacted into the SIP. The NOV states that Rule 209 provides that "When equipment which has been granted a permit is altered, changes location, *changes ownership or* no longer will be operated by the permittee, the permit becomes void." Exh. C to Kuhn Decl., p.12 (emphasis added). The italicized language is not part of SIP-approved Rule 209.

Additionally, the NOV does not mention Rule 301 or attempt to harmonize Rule 209 with other SIP provisions. Next, as Defendants note, EPA has not pursued its initial allegations regarding Rule 209 against Cenco but has instead entered into a stipulated consent decree. The United States' complaint against Cenco relies on numerous provisions of the SIP but does not even mention Rule 209. Finally, SCAQMD has never read its own Rule 209 to void a permit in a change of operator transaction. Thompson Decl. 8. For all these reasons, and the Court's basis, explained above, for adopting Defendants interpretation of Rule 209, the Court declines to defer to the apparent construction of the Rule in the NOV.

The Court must determine whether under the SIP the NSR requirement applies to alterations or modifications only if there is an increase in emissions. Rule 209 does not expressly confront the issue; it says nothing about NSR. But Rules 1303 and 2005 do indicate that NSR applies to modifications or alterations accompanied by emissions increases. *See* Rules 1303(a)(1); 2005(c)(1) ("[t]he Executive Officer shall not approve an application for a Facility Permit Amendment to authorize the installation of a new source or modification of an existing source which results in an emission increase as defined in subdivision (d), unless the applicant demonstrates that: [BACT] will be applied to the source . . ."). CBE appears to acknowledge that Rules 1303 and 2005, the SIP Rules that discuss NSR, do dictate that NSR apply to emissions increases. Motion, p.13; Reply, p.8 (arguing that NSR applies because "the proper baseline emissions for NSR purposes for the refinery was zero emissions"). Indeed, CBE does not explain what role Rules 1303 and 2005 would serve if Rule 209 requires that *any* modification or alteration calls for NSR, regardless of whether there was an increase in emissions.

In light of Rules 1303 and 2005, the Court finds Defendants' reading of the "alteration" clause in Rule 209 persuasive: "Rule 209 applies only (a) when an owner of permitted equipment alters the equipment such that the alteration results in a discrepancy between the equipment and the equipment description in the permit . . ." DAMF 31. This interpretation is consistent with Rule 209's purpose to ensure that SCAQMD maintains accurate records of permitted equipment, who possesses the equipment and exactly how that equipment is characterized. In other words, as with transfers, it is those altera-

tions that are unreported to SCAQMD that automatically void equipment permits. NSR, on the other hand, is required when alterations raise emissions.

### b. Increase in Emissions: The Proper Baseline

CBE next argues that the alterations to refinery equipment *did* increase emissions and so under Rules 209, 1303 and 2005 they did require NSR because the shutdown facility's "baseline" emissions were zero. Reply, p.8. CBE relies on the definition of emissions increase in Rule 2005(d) [8]: "an increase in emissions occurs if a source's maximum hourly potential to emit immediately prior to the proposed modification is less than the source's post-modification maximum hourly potential to emit." CBE asserts that "immediately prior" to the alterations and proposed alterations, the facility's potential to emit was zero because 1) the permit to operate had expired on January 31, 1998, leaving no legal opportunity to emit and 2) actual emissions had been zero since 1995, when the facility suspended refining operations. Therefore, any resumption of operations following any alterations would increase emissions over the baseline of zero.

The Court rejects CBE's first argument. The mere fact that in 1998 Powerine voluntarily let its facility permit expire for failure to pay fees does not compel finding that NSR applies to the facility based on a zero emissions baseline. SIP Rule 301(d)(7) provides that a "permit which has expired due to non-payment of fees *may be* reinstated only by submitting a new application for permit accompanied by an application fee and the payment in full of the amount of fees due at the time the previous permit expired, if such reinstatement request is made within 24 months of the

---

**8.** Rule 1303 does not include a definition of emissions increase.

date of expiration." (emphasis added). Under Rule 301, SCAQMD need not treat a source as a new source subject to NSR, as if going through permitting for the first time, just because a permit expired due to non-payment of fees; instead, the expired permit may simply be reinstated upon payment of the fee. The issue is money, not operability. Indeed, here, Powerine allowed its permit to expire with the express understanding from SCAQMD that SCAQMD *would* reinstate the permit later under Rule 301 if Powerine paid fees within a year. DAMF 16–17.

CBE's interpretation of 2005 would appear to nullify 301(d)(7) because it would require all equipment whose permit has expired, no matter how recently, to be treated as a new source subject to NSR, notwithstanding that Rule 301(d)(7) contemplates reinstatement of *old* and expired permits. The Court rejects this reading in light of Rule 301(d)(7).[9]

■ CBE's alternative argument, that the refinery's emission baseline is zero in light of five years of non-emission, is weak. CBE accepts Rule 2005(d) as providing the definition of an emissions increase due to an alteration under the SIP. Reply, p.8. That Rule clearly provides that an emissions increase occurs if a source's *"potential to emit"* increases with an alteration or modification. Rule 1302(y) defines "potential to emit" as "the amount of pollutants calculated (1) using a calendar monthly average and, (2) on a pound-per-day basis from permit conditions which directly limit the emissions, or when non

such conditions are imposed, from: (1) the maximum rated capacity; and (2) the maximum daily hours of operation; and (3) the physical characteristics of the materials processed." CBE appears to argue that the refinery's potential to emit prior to the alleged alterations and modifications was zero because starting in 1995 its *actual* emissions were zero. But the mere fact that the facility was not actually emitting immediately prior to alterations does not mean it had no potential to emit at that time. Indeed, the federal regulations and cases discussing them that CBE relies on for indirect support [10] of its position undercut CBE's position. *WEPCO v. Reilly*, 893 F.2d 901, 916 (7th Cir.1990) (source can have potential to emit in absence of any operations); *Puerto Rican Cement Co. v. EPA*, 889 F.2d 292, 297 (1st Cir.1989) (same). The Court finds that under the "potential to emit" standard in Rule 2005(d), CBE is incorrect that the facility's emissions baseline was zero prior to alterations or modifications.

### c. Summary: Alterations

In sum, CBE has failed to demonstrate as a matter of law that alterations to some of the Refinery equipment voided the facility permit or require the application of NSR to the facility as a whole under Rule 209. CBE's contentions would require NSR every time a refiner subjected equipment to routine maintenance or to improvements. Such disincentives to capital improvements would hardly achieve the objectives of the CAA.

**9.** CBE correctly points out that under Rule 1302(y), potential to emit is calculated "from permit conditions which directly limit the emissions." CBE takes the quoted language to mean that if a permit has expired, then emissions are limited to zero and potential to emit must be zero. Read reasonably and in context, the quoted language of Rule 1302(y) means simply that if a permit governing a

certain piece of equipment expressly limits emissions in a certain way, potential to emit should not be calculated without taking that specific limit into account.

**10.** CBE asserts that "EPA regulations *confirm* that the Refinery is a new source." Reply, p.9.

*3. The Six–Year Shutdown of the Facility, in Conjunction with Refinery Modifications, Triggers New Source Review Under the Clean Air Act*

CBE asserts that under both Rule 209 and the EPA's "Reactivation Policy," the Refinery was permanently shutdown and modified such that New Source Review applies. The thrust of CBE's argument is that because Powerine indicated an intent to permanently shutdown the Refinery, because the Refinery was then in fact shutdown for six years with no emissions, and because the Refinery will utilize different equipment and refine a different product ("reformulated gasoline") than the old facility, the Clean Air Act compels treating the Cenco Refinery as a new source, subject to the emissions requirements of the CAA's NSR program.

*a. CBE Has Made a Strong Showing That Rule 209 Voids Permits for Equipment That Has Been Permanently Shutdown*

█ Rule 209 states that "[w]hen equipment which has been granted a permit . . . no longer will be operated by the permittee, the permit shall become void." CBE asserts that Defendants violated the plain language of the Rule "because Powerine informed SCAQMD that it would no longer operate the Facility." Motion, p.9.

Defendants respond that the quoted language of Rule 209 does not void permits upon the suspension of operations, but merely voids permits the equipment for which will be operated by a new owner when no change of ownership application has been filed. In other words, Defendants assert that the "no longer will be operated by the permittee" language merely explains what happens to permits (they are voided) when unauthorized transfers are attempted; it does not add an additional ground (suspension of operations) for voiding permits. In support, defendants assert that:

> CBE's interpretation would have the effect of severely punishing a business that runs into financial trouble and must cease operating temporarily. Under CBE's view, such a facility would lose its permit to operate and could not reopen without incurring the expense and delay of NSR.

Opposition, p.12.

However, CBE counters that under its reading of Rule 209 not every suspension of operations necessarily voids a permit; instead, only a "shutdown" with the intent to shutdown *permanently* voids a permit under the "no longer will be operated by the permittee" language of Rule 209. This interpretation of the Rule is consistent with its language, is consistent with the EPA's Reactivation Policy, does *not* trigger the adverse consequences suggested by Defendants because it would not apply to clearly temporary operations suspensions, and addresses the practical concern that a long shutdown facility or one intended to be permanently closed presumptively should be subject to stringent emissions review upon its later resurrection.

Defendants assert that Rule 301 is inconsistent with CBE's interpretation of Rule 209 because Rule 301 allows reinstatement of permits that have expired due to non-payment of fees. This is incorrect. Subsection 301(d)(7), discussed *supra*, provides that reinstatement is allowed only "if such reinstatement request is made within 24 months of the date of operation." The Rule in fact supports CBE's position that Rule 209 voids permits for equipment that an owner has indicated he is permanently shutting down because it states that after a certain period of non-operation and non-payment of fees, equipment permits *cannot* be reactivated; rein-

statements are permissible *only* within a 24 month period.

At this point, the Court declines to rule that as a matter of law, either CBE's or Defendants' interpretation is correct. The statutory language and the record before the Court do not compel either result. However, the Court finds that CBE has at least made a showing of likelihood of success: CBE may very well demonstrate that Rule 209, quite sensibly, voids permits for equipment that has been shutdown or abandoned.

> b. *CBE Has Made a Strong Showing That the Factors in EPA's Reactivation Policy (Concerning the Application of NSR to Permanently Shutdown Facilities) May Be Taken into Account In Interpreting the Clean Air Act*

 Defendants do not dispute that the EPA has a 20–year–old policy of subjecting pollution sources that were permanently shutdown to New Source Review if those sources are restarted. *See In the matter of Monroe Electric Generating Plant Entergy Louisiana, Inc., Proposed Operating Permit,* Petition No. 6–99–2, "Order Partially Granting and Partially Denying Petition for Objection to Permit," dated June 11, 1999. Defendants also admit that SCAQMD in fact applied the Reactivation Policy criteria to the Cenco facility. *See* Mueller Decl. 8. Nevertheless, defendants assert that the EPA Policy is unenforceable because it was not properly promulgated and is not a reasonable interpretation of the Clean Air Act subject to this Court's deference.

Defendants correctly assert that if the Policy imposes new substantive obligations above and beyond or different from those in the Clean Air Act, it is a "legislative rule" subject to notice and comment procedures under the Administrative Procedures Act. Opposition, p.27. It is undisputed that the Reactivation Policy was not subjected to notice and comment.

Defendants next assert that the Policy adds or changes obligations because 1) the CAA limits NSR to construction of new or modified facilities and EPA regulations "specifically exempt activities such as resumption of refining activities ... from the definition of 'modifications' subject to NSR," Opposition, p.27; and 2) "[t]here is absolutely nothing in the Act or regulations which would suggest that interruptions in the operations of existing, permitted sources trigger NSR," Opposition, p.28.

However, CBE makes a strong showing that the Reactivation Policy is a reasonable interpretation of Clean Air Act regulations that does not conflict with any terms of the NSR program. NSR regulations indicate that for a long-dormant facility (at least those shutdown for two years or more), the emissions baseline for determining whether it has undergone an emissions increase subject to NSR will be zero.[11]

---

11. *See* 40 C.F.R. §§ 51.165(a)(1)(vi)(A)(1), 51.166(b)(3)(i)(a) (NSR triggered by increase in "actual emissions"); 40 C.F.R. §§ 51.165(a)(1)(xii)(B), 51.166(b)(21)(ii) ("In general, actual emissions as of a particular date shall equal the average rate ... at which the unit actually emitted the pollutant during the two year period which precedes the particular date [the date of change] and which is representative of normal source operations"); 57 Fed.Reg. 32314, 32325 (July 21, 1992) (rejecting that EPA should consider a two year period within the last five years of a plant's *operation* as the representative period for plants that have been shutdown for more than five years); *In the matter of Monroe Electric Generating Plant Entergy Louisiana, Inc., Proposed Operating Permit,* Petition No. 6–99–2, p. 15, dated June 11, 1999 (stating that EPA "has applied its discretion narrowly in assigning representative periods other than the two years immediately preceding the

Therefore, such a facility is subject to NSR upon restart, assuming the requisite increase in emissions over the zero baseline.

Although Defendants assert that the Policy applying NSR to permanent shutdowns conflicts with 40 C.F.R. §§ 51.165(a)(1)(v)(C)(6), that regulatory subsection states merely that "increase[s] in hours of operation or in the production rate," alone, do not constitute "modifications" subject to NSR. This provision is not inconsistent with finding that here, under the Reactivation Policy, 1) there is not a mere variation in the hours of operation but a fundamental change in the facility's operational status, from six years of non-operation to full operations and 2) the restart will be accompanied by independent physical modifications to the Refinery triggering a comparison of new emissions to the zero baseline.

The Court finds on these bases that CBE has made a persuasive showing that the Reactivation Policy is a permissible and reasonable standard to apply in interpreting the Clean Air Act. Although the parties dispute whether EPA's interpretation is entitled to "deference" or "respect," no one contends that the Court must ignore a federal regulatory agency's reasonable analysis of its own regulations.[12]

c. *CBE Has Made a Strong Showing That the Refinery Was Permanently Shutdown Under Rule 209*

 The Court also finds that CBE has demonstrated that it is likely to suc-

ceed on the issue of whether the Refinery would "no longer be operated" or was "permanently shutdown."

The SIP does not expressly describe what factors are important to an analysis of whether a facility would no longer be operated by the permittee. However, the EPA's Reactivation Policy, which requires the application of NSR to facilities that have been "permanently shutdown" and thus addresses the same concern embodied in the "no longer will be operated" clause of Rule 209, does lay out a series of factors to be considered. The Court finds these factors apt and analyzes the Cenco refinery in their light, as well as the parties' contentions.

Under the Reactivation Policy,

EPA has examined factors such as the amount of time the facility has been out of operation, the reason for the shutdown, statements by the owner or operator regarding intent, cost and time required to reactivate the facility, status of permits, and ongoing maintenance and inspections that have been conducted during shutdown . . .

*In the matter of Monroe Electric Generating Plant Entergy Louisiana, Inc., Proposed Operating Permit,* Petition No. 6–99–2, p. 9–11, dated June 11, 1999.

i. *Two Years or More of Non-operation*

CBE asserts that the Refinery must be presumed permanently shutdown because

---

physical or operational change"). In light of these regulations focusing the calculation of emissions baseline on actual emissions in the two years preceding a change, "EPA has made clear that in calculating the net emissions increase for reactivation of long-dormant sources potentially subject to PSD, the source is considered to have zero emissions as its baseline." *Monroe,* at 16.

**12.** In light of the Court's ruling that CBE has made a strong showing that the criteria set out in the Reactivation Policy may be taken into account and are a reasonable interpretation of the CAA, and SCAQMD's admission that it in fact applied the Reactivation Policy criteria to the Cenco refinery, the Court rejects Defendants' argument that they did not have "fair notice" of the Policy.

it was not operational for not just two but six years. Defendants respond merely that "various operations have been conducted at the facility virtually throughout the time period in question." Opposition, p.20. However it is undisputed that the facility has not refined crude oil since 1995. Moreover, Cenco appears to have made admissions that any activity at the facility was that of a "skeleton staff that oversees the maintenance of its assets, which consist of an oil refinery and related assets." Reply Request for Judicial Notice, Exh.4. Such maintenance-oriented activities are not sufficient to contradict that the Refinery did not operate for five years.

### ii. Reason for Shutdown

CBE contends that the Refinery shutdown for economic reasons and that such shutdowns are "generally considered 'permanent' under the reactivation policy." Motion, p.18. However, although in some instances that EPA has found facilities that had shutdown for economic reasons permanently shutdown, the economic reasons appeared to be incidental to the decisions. It appears that under the Reactivation Policy, an economic reason for shutdown, standing alone, does not militate in favor of finding one way or the other.

### iii. Intent and Plans to Restart

CBE quotes *Monroe Electric*, at 10–11, for the proposition that where a facility has been shutdown for over two years, owners and operators "must continuously demonstrate concrete plans to restart the facility sometime in the reasonably foreseeable future. If they cannot make such a demonstration, it suggests that for at least some period of the shutdown, the shutdown was intended to be permanent." As CBE points out -

• In June 1995, Powerine wrote SCAQMD that it would be shutting down its refinery beginning the first week in July, 1995. PSUF at 8. Powerine suspended all refining operations on July 3, 1995 and has not refined crude oil since that date. Id. at 9.

• In October 1995, Powerine informed SCAQMD that it was "in the process of shutting down the refinery for its ultimate dismantling" and that Powerine's new parent company planned to dismantle the refinery. Id. at 12–13. Also in October 1995, Powerine applied to SCAQMD to obtain Emission Reduction Credits. Id. at 14. Moreover, Powerine repeatedly requested suspension of regulatory reporting requirements due to the refinery having suspended operations. Id. at 41.

Defendants respond that Powerine repeatedly expressed its intent to resume crude oil refining both to SCAQMD and to other entities. For example,

• In December 1995, Powerine informed various state entities, including the Los Angeles Regional Water Quality Control Board, that the refinery might be resuming crude oil processing. DAMF 60. It informed the Regional Water Quality Control Board that Powerine was negotiating with a prospective buyer who "plan[ned] to bring the refinery back in operation, and rehire the majority of 350 laid off employees" and "desire[d] to purchase the refinery equipment back from Kenyen Projects Ltd, the firm which purchased the refinery equipment and had been making plans to dismantle the refinery equipment and transport it to India." Christman Decl., Exh.16.

• Powerine wrote numerous letters to SCAQMD from January 1996 to January 1998 explaining that it sought to keep open the possibility of restarting the facility. *See* January 10, 1996 letter, Christman Decl., Exh.17 (seeking extension from Fee

Review Committee "to enable Powerine to pursue an option that may result in a restart of refining operations").

Although Powerine repeatedly attempted to secure the option of resuming refining, it does appear that there was at least one period during which the shutdown was intended to be permanent—the period between September 1995 when Powerine contracted with Kenyen and December 1995 when Powerine informed a state agency that it was negotiating with a buyer who sought to potentially resume refining operations. This would appear to negate any showing by Defendants that Powerine *continuously* planned to restart the facility. Defendants' evidence that Powerine management was not happy with the deal its parent Castle had cut with Kenyen is insufficient to show that Powerine had an intent to reopen the facility and concrete plans to do so at the time.[13] Moreover, it is not clear that Powerine had "definite plans to restart" the facility or an "expect[ation] to use" the facility "in the foreseeable future" throughout the shutdown period. *See Monroe Electric* at 19, 20. Defendants proffer a declaration from a Cenco V.P. and former Powerine C.F.O. that "Powerine made extensive efforts to obtain financing in order to resume crude oil refining during the 1995 to 1998 time period" and "held discussions with numerous entities regarding financing for crude oil refining operations." However, this hardly establishes definite plans to restart the facility in the foreseeable future.

Under the literal language of *Monroe*, Defendants carry the burden of showing continuous intent to reopen and definite plans to restart in the foreseeable future. The Court finds that although Defendants have raised a triable issue as to their

intent, CBE is likely to succeed on the merits.

### iv. Cost and Time Required to Reactivate

Although the parties dispute the exact numbers, it is clear that reactivation costs will equal between $28 million and $180 million. That huge disparity results primarily from the fact that Cenco is not only resuming refining operations but is making many "non-essential" upgrades to the facility as well. Defendants assert that mere "turnaround costs" are $28 million, while the total cost including all upgrades is much higher.

There is also a large disparity between the estimates for time to reactivate the facility. CBE estimates 18 months while Defendants estimate six months.

Even accepting Defendants' estimates, the numbers are higher than in other cases where the EPA found facilities permanently shutdown. Motion, p.18–19. Nevertheless, Defendants proffer evidence that turnarounds, like the one here, are routine every three to five years in the industry. Christman Decl. 19.

Overall, the cost and time for reactivation factor slightly favors finding a permanent shutdown.

### v. Status of Permits

Although CBE points out that Powerine allowed its facility permit to expire in 1998, Powerine did so with the express understanding that the permit could be reinstated within a year if fees were paid. Powerine reinstated the permits within six

---

**13.** Equally insufficient, standing alone, is defendants' evidence and argument that the Kenyen deal was contingent on financing and that Powerine management doubted that Kenyen would be able to go through with the deal.

months. Christman Decl. 18. Moreover, Powerine kept its other permits up to date throughout the period of suspension of operations.[14] Id. at 11, 14, 15. This factor favors finding no permanent shutdown.

### vi. Ongoing Maintenance and Inspections

It is undisputed that around two dozen employees have worked at the refinery since 1995 to maintain equipment. DAMF 68. This factor supports finding no permanent shutdown.

### vii. Summary

CBE's strongest point is that Defendants have not shown that Powerine had a continuous intent and concrete plans to restart the facility. Although it is a matter of some factual dispute, it does appear that for at least some short period of time, Powerine intended to shutdown and dismantle the facility, not restart it. *Monroe Electric* indicates that this is fatal. On this basis, CBE may have demonstrated at least a likelihood of success on the merits of the Reactivation Policy, but not enough to warrant summary judgment, given the disputes about not only the facts but the

permissible or necessary inferences from facts.[15]

### 4. Miscellaneous SIP Provisions

CBE asserts that Defendants violated several other SIP provisions: Rule 2005(c)(2) requiring that a facility hold sufficient RECLAIM trading credits to offset facility emissions for the first year of operation (FAC Fifth Cause of Action); Rule 201 prohibiting construction without first complying with NSR (FAC Seventh Cause of Action); Rule 210 prohibiting submission of incomplete or inaccurate information—here, failure to submit materials required by NSR—to SCAQMD (FAC Seventh Cause of Action); and Rule 212 requiring a 30 day Public Comment period for grants of permits (FAC Second Cause of Action).

Defendants' only persuasive defense to these claims is that if CBE loses on its NSR claims, then it loses on these claims as well. But because this Court has found that CBE has shown a likelihood of successfully showing that NSR applies to the facility, the Court finds that it has also shown a likelihood of successfully showing that Defendants violated these SIP provisions.

---

14. As Defendants pointed out at the hearing, SCAQMD maintained the Refinery on its emissions inventory. This too militates in favor of finding no permanent shutdown.

15. The Court acknowledges that at least on the surface there could be a tension between the analysis in section A.2.ii concerning the proper baseline for emissions under Rule 2005(c) and the conclusion in this section. The tension is only apparent, however, not real. Rule 2005(c) and (d), calling for a comparison of a facility's pre-modification and post-modification "potential to emit," apply to "Requirements for *Existing* Reclaim Facilities," and modifications to those existing facilities. In section A.2.ii, the Court addressed CBE's contention that mere alterations, put-

ting aside the facility's shutdown, necessitated NSR. However, in section A.3 of this Order, the Court finds that CBE has shown a likelihood of demonstrating that the Facility needs to be treated as new because it was intended to be permanently shutdown under Rule 209. Therefore, the restarted facility's emissions should be compared to a baseline reflecting the pre-restarted facility's non-existent actual emissions during its six years of shutdown. (Footnote 11 of this Order discusses regulations calling for the comparison of a facility's actual emissions). Defendants do not dispute that under the Clean Air Act, NSR applies to the Refinery if it is deemed a new facility with an emissions baseline of zero.

## B. Relief

 The Court finds that although CBE has not demonstrated an entitlement to summary adjudication of any of its claims, it has shown a likelihood of success on the merits, for the reasons above.

 CBE has also made a showing of irreparable harm. It is undisputed that "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least long of duration, i.e., irreparable." *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Here, Defendants admit that compliance with NSR and installation of BACT on every emissions source would lower the Refinery's emissions of air pollutants. PSUF 127–128.

 Moreover, when environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment. *See Save the Yaak Committee v. Block*, 840 F.2d 714, 722 (9th Cir.1988). Although Defendants assert, without evidence, that there is a gasoline shortage and that the Cenco Refinery will help reduce it, the Court finds the public interest favors enforcing the Clean Air Act and protecting the environment.

Although CBE has not made a showing that environmental harm is immediate, CBE has demonstrated that NSR should have been applied to the facility and that permits have already issued allowing construction on and operation of the Refinery. Under these circumstances, the Court finds that an injunction preliminarily precluding Defendants from performing the permitted construction on or operation of the Refinery without applying NSR is warranted.

The Court has not received any proposed order from CBE detailing all aspects of the proposed preliminary injunction. CBE is therefore Ordered to do so by not later than seven calendar days from the date of this order. The terms of the injunction should be consistent with CBE's request for relief at pages 2–3 of its opening motion.

 Although CBE cites some authority approving of waiving the bond requirement in environmental citizen suits, *People ex rel Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325 (9th Cir.1985), the Court is not persuaded that a bond would be inappropriate in this case. Therefore, Defendants are ordered to present the Court with documentation as to what would constitute an appropriate bond, taking into account the apparent non-commercial, non-profit status of CBE, by not later than five calendar days from their receipt of CBE's proposed order.

## IV. CONCLUSION

For the reasons set forth above and good cause appearing therefore, the Court DENIES CBE's motion for summary adjudication and a permanent injunction and GRANTS CBE's motion for a preliminary injunction.

IT IS SO ORDERED.